Filed 7/12/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S057242 |
| v. | ) | |
| | ) | |
| CHRISTOPHER ALAN SPENCER, | ) | |
| | ) | Santa Clara County |
| Defendant and Appellant. | ) | Super. Ct. No. 155731 |
| _____ | ) | |

A jury convicted defendant Christopher Spencer of murdering James Madden. (Pen. Code § 187; all further undesignated references are to this code.) It also found true the special circumstance allegations that Spencer murdered Madden while robbing him and burglarizing his place of business. (§ 190.2, subd. (a)(17).) The jury returned a verdict of death, prompting this automatic appeal. (Cal. Const., art. VI, § 11; Pen. Code § 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

On January 24, 1991, four days before Madden was fatally stabbed, a group of men robbed Ben Graber outside of a liquor store in San Jose. One of the men shocked Graber with a stun gun. The use of this weapon, along with tips from an informant, eventually led the police to Daniel Silveria, John Travis, Matthew Jennings, Troy Rackley, and defendant Spencer. By the time police located and arrested the men, they had murdered Madden — a crime for which three of the

1

four adult defendants, Silveria, Travis, and Spencer, were convicted and sentenced to death.[1]

## A. Robbery of Graber at the Gavilan Bottle Shop

On the evening of January 24, 1991, a group of men stopped Ben Graber as he was leaving his job at the Gavilan Bottle Shop located in San Jose. One of the men shocked Graber on his hip with a stun gun. They robbed Graber and took cash from the store.

### 1. *The Stun Gun Robbery Investigation*

John Boyles, a detective with the San Jose Police Department, investigated the Gavilan Bottle Shop robbery and another robbery at a Quik Stop convenience store that also involved the use of a stun gun. During his investigation, Detective Boyles learned that Troy Rackley and Matthew Jennings had been identified as suspects in the robberies. Detective Boyles disseminated this information generally via a broadcast "over all our channels within the City of San Jose" and specifically to Officer Brian Hyland, an officer assisting Detective Boyles with the investigation.

At approximately 5:00 p.m. on January 28, 1991, Detective Boyles received a phone call from a female informant. The informant named "Danny, John, Matt, Chris and Troy" as the perpetrators of the stun gun robberies. Later that night, Detective Boyles had another phone conversation with a woman identifying herself as "Cynthia." Based on her voice and the information she provided, Detective Boyles identified Cynthia as the female informant with whom he had

---

[1] Rackley was a minor at the time of the murder. He pleaded guilty and received a sentence of 25 years to life. Jennings, who did not stab Madden, was sentenced to life without the possibility of parole. (*Jennings v. Runnels* (9th Cir. 2012) 493 Fed. Appx. 903.)

spoken earlier. Cynthia provided the detective with additional information about the robbers.

Officer Hyland tracked down the suspects' addresses. In speaking to various family members of the group, Officer Hyland corroborated specific aspects of the tip provided by Cynthia. Because Officer Hyland had learned from the message of the informant that the group was planning to commit another robbery, he told everyone with whom he spoke to call 911 if they saw any of the suspects.

2. *The Arrest*

At approximately 6:45 p.m. on January 29, 1991, an unidentified male called the San Jose police to alert them that the stun gun robbery suspects were at the Oakridge Mall. Officers arrived at the mall and, at the direction of Officer Hyland, stopped two vehicles matching descriptions given by the caller — a Datsun Z and a Honda Civic. Silveria was driving the Honda, and Travis was driving the Datsun with Rackley as a passenger. The police arrested all three individuals. A search of the vehicles yielded over $2,500 in cash from the Datsun, $694.40 from the Honda, and a stun gun and a roll of duct tape in the Honda's hatchback.

Officer Hyland soon arrived at the scene of the Oakridge Mall arrests. He spoke with Silveria, who gave Officer Hyland a description of the cars Jennings and Spencer were driving and told the officer that the two were planning to leave town. Officer Hyland had Silveria page Jennings, who called back. Jennings said that he and Spencer were at a friend's house. Because Silveria knew the location but not the address of the friend's place, the police brought Silveria along to direct them. Silveria brought the officers to Alice Gutierrez, Christopher Wagner, and

3

John Durbin's shared apartment and pointed out Spencer's newly acquired 1979 Triumph Spitfire in the parking lot.

Officer Hyland went up the stairs and saw Durbin in the apartment. Durbin said that Jennings and Spencer had gone to the store but would return. When the police searched the apartment, they discovered two packages containing $282 and $721 in cash.

Officer Larry Esquivel waited downstairs for Jennings and Spencer to return. When a red Chevrolet pickup truck pulled up, matching the description of the vehicle that Officer Esquivel had been expecting, police officers arrested its occupants, who turned out to be Jennings and Spencer.

## B. Murder of Madden at Leewards

Madden worked as a manager at a Leewards craft store in Santa Clara. On the night before the robbery suspects were arrested, Madden was the last to leave work. At 10:53 p.m., an alarm went off at Leewards. A dispatcher from the alarm company spoke to someone at the store, but did not summon the police as the person on the other end gave the correct passcode. When Leewards employees arrived at the store the next morning, they discovered Madden's body.

### 1. The Murder Investigation

Detective Sergeant Ted Keech of the Santa Clara Police Department and his partner responded to the crime scene at Leewards at approximately 8:15 a.m. on January 29, 1991. Sergeant Keech observed Madden's body lying on the floor next to a tipped-over chair. Madden's hands and feet were bound with duct tape, and he had duct tape wrapped around his face. His body showed numerous puncture wounds, later counted to be 32 in total. In the office where Madden's body was found, Sergeant Keech observed empty register trays and ripped-open plastic bags on top of an empty safe.

4

After reviewing the scene and interviewing the assistant manager, Sergeant Keech concluded that whoever committed the robbery must have had some familiarity with Leewards's procedures. He then looked through personnel files and noted that Silveria and Travis were recently terminated from the store. Sometime thereafter, Sergeant Keech learned that Silveria and Travis, along with the other suspects, were in the custody of the San Jose Police Department. He made his way to the station and arrived shortly after midnight.

2. *The Interrogation*

About an hour before Sergeant Keech arrived, or at around 11:30 p.m. on January 29, Detective George De La Rocha of the San Jose Police Department began questioning Spencer. Detective De La Rocha advised Spencer of his *Miranda* rights, which Spencer waived. As Detective De La Rocha was unaware of the Leewards murder when he conducted the interview, his questions centered on the Gavilan Bottle Shop incident. Spencer admitted to driving the getaway car during this robbery and getting paid $70 for his participation. He also said that on the night of January 28 — when Madden was killed — he was with Silveria, Travis, Jennings, and Rackley.

At about 4:00 a.m. the next morning, or less than five hours after waiving his *Miranda* rights, Spencer began talking to Sergeant Keech and his partner, the officers investigating the Leewards break-in. Sergeant Keech took charge of the interview and interrogated Spencer about Madden's murder. While Spencer initially denied any involvement, he eventually confessed and gave a detailed account of what had happened two nights earlier.

According to Spencer, the plan to rob Leewards was Silveria's idea, and it was Silveria and Travis who called the shots at the scene. As they were planning the robbery, Silveria and Travis mentioned the possibility of killing Madden

5

because he could identify them as former employees. When Silveria, Travis, Jennings, Rackley, and Spencer arrived at the Leewards parking lot, they saw Madden's vehicle parked in the lot. Silveria told Spencer to slash Madden's tires, which Spencer did. Spencer, along with Silveria and Travis, accosted Madden as he exited Leewards. While Jennings and Rackley remained outside as lookouts, Silveria, Travis, and Spencer went with Madden back to the store. The three took Madden to his office and bound him with duct tape. When the alarm company called, Spencer took the tape off Madden's face so he could give the passcode to the dispatcher.

Spencer stated that as they were getting ready to leave, Travis told Silveria and Spencer to kill Madden. Spencer stabbed Madden three or four times in the chest — admitting that he was the first to stab the victim — while Silveria shocked him with the stun gun. Silveria and Travis subsequently also stabbed Madden. All five perpetrators then left in Spencer's Dodge Charger.

The men obtained between $9,000 and $10,000 from the robbery. Spencer used his share of the money to buy a Spitfire (trading in his Charger) and new clothes. He also said that he gave the shoes that he was wearing during the robbery to a Foot Locker store in Oakridge Mall to throw away.

The interrogation ended at approximately 5:30 a.m. on January 30, about an hour and a half after it began.

## C. Prosecution of Spencer

The People charged Spencer with the murder and robbery of Madden, the burglary of Leewards, and the robbery of Graber at the Gavilan Bottle Shop. The indictment also alleged several special circumstances, although the trial court later granted the prosecutor's motion to strike the lying-in-wait and torture allegations. Spencer's trial, severed from his codefendants', commenced on June 10, 1996.

6

*1. Guilt Phase*

During the guilt phase of the trial proceeding, the prosecution introduced Spencer's confession, as well as corroborating evidence from various sources. For example, the prosecution elicited the testimonies of Gutierrez and Wagner, two of the roommates at the apartment complex where Spencer was arrested. Gutierrez testified that two weeks before the murder, she had seen Jennings waving around a stun gun with the other members of the group (Silveria, Travis, and Spencer) present. She further testified that on January 29, 1991 — the day after Madden's murder — Jennings and Spencer came to the apartment wearing new clothes and Spencer had a package of money and a suitcase. Spencer said he wanted to leave California to go to Kentucky. Wagner corroborated some of Gutierrez's account and testified that Spencer asked him to listen to a police scanner Wagner owned because Spencer thought "the police were looking for him."[2] Likewise, the facts that Silveria, Travis, Jennings, and Spencer bought cars and made payments in cash on January 29 were corroborated by the testimonies of salespeople at the car dealerships.

The prosecution also introduced into evidence a pair of shoes recovered from the dumpster at the Oakridge Mall — the mall where Spencer said he left the shoes he wore during the Leewards robbery. An expert in shoe prints testified that one of those shoes matched a footprint at the Leewards crime scene. Finally, the prosecution presented testimony from a Santa Clara County Coroner's Office medical examiner. Doctor Parviz Pakdaman testified that Madden suffered 32 stab wounds: 5 to the neck, including 1 that severed his trachea; 24 to the chest, causing multiple penetrations of his lungs and heart; and 3 to the abdomen, 2 of which penetrated the liver. Madden also had some abrasions on his thigh,

---

[2] Wagner provided some inconsistent testimony, later saying that Spencer did not tell him why he wanted him (Wagner) to turn on the scanner.

presumably from the stun gun.  Doctor Pakdaman opined that the cause of death was stab wounds to the neck, chest, and abdomen.

The defense did not present an affirmative case.  Instead, it focused on attacking the prosecution's case-in-chief, primarily by challenging police procedures used in the investigation and interrogation.

On August 21, 1996, the jury returned guilty verdicts on all counts.  It also found true the special circumstances that Spencer committed first degree murder while engaged in robbery and burglary.

## 2.  *Penalty Phase*

During the penalty phase, the prosecution presented three types of evidence:  testimonies regarding how Madden died; testimonies from witnesses who observed the immediate response of Madden's wife and child upon learning of his death; and victim impact statements from members of Madden's family.

The medical examiner, Doctor Pakdaman, gave testimony indicating how much Madden was likely to have suffered before he died.  He opined that Madden was breathing when his lungs or trachea were penetrated and that he was alive when he toppled from the chair.  Doctor Pakdaman "guesstimated" that Madden died 15 to 30 minutes after the first wound.  During the examiner's testimony, the prosecution displayed on a mannequin the shirt Madden had been wearing at the time of the murder.  The shirt was obviously bloodied, and markers had been attached to it to identify punctures and cuts in the fabric.  Sergeant Keech, who authenticated the item, admitted on cross-examination that additional bloodstains got on the shirt when Madden's body was transported to the coroner's office.  Doctor Pakdaman likewise confirmed that there was a difference between the amount of blood on Madden's shirt as observed at the murder scene and when the body was delivered to the coroner's office.

8

Shirley "Sissy" Madden was the victim's wife. Two of her coworkers testified about Sissy's behavior when she arrived at work on the morning of January 29, 1991. According to Susan Thuringer, Sissy was visibly upset. Sissy told Thuringer and Kay House, another coworker, that her husband did not come home the previous night. Thuringer then learned from the police that Madden had died. She and House broke the news to Sissy. Sissy "reacted like . . . a wounded animal," "screamed," "flail[ed] around," and had to be "restrained" while her coworkers tried to comfort her. Thuringer and House, along with police officer Brian Lane, accompanied Sissy home, where they witnessed Sissy telling her seven-year-old daughter, Julie, that her father had died. Thuringer recalled Julie screaming. Thuringer's account was confirmed by House, who further stated that Sissy still had a lot of trouble handling her husband's death. Officer Lane also testified briefly about his interaction with Sissy.

Four members of Madden's family gave victim impact statements. These included Madden's wife, his mother, sister, and brother-in-law. The gist of the testimonies was Madden's relationship with his family and the impact his death had on their lives.

In mitigation, the defense put on testimony from Spencer's grandmother, mother, father, sister, half-sister, half-brother, and middle school teacher. The witnesses testified to Spencer's difficult upbringing, marred by poverty, a dysfunctional family, and drug use. They emphasized that Spencer was a follower, not a leader.

On September 19, 1996, the jury returned a recommendation of death. The trial court sentenced Spencer accordingly, and this appeal followed.

## II. DISCUSSION

Spencer raises a number of issues on appeal, most of which focused on purported errors made by the trial court. These include: erroneous exclusion of a

9

venireman; admission of Spencer's confession despite the lack of probable cause to arrest, *Miranda* advisement, and voluntariness of the confession; admission of inflammatory evidence, including excessive victim impact statements, unduly prejudicial physical evidence, and comments by the prosecutor amounting to misconduct; and erroneous jury instructions given during the penalty phase with regards to the robbery of Graber at the Gavilan Bottle Shop. Spencer also complains of this court's decision not to supplement the appellate record with his codefendants' trial transcripts. Finally, Spencer brings the usual challenges against the constitutionality of California's death penalty scheme. We consider these claims in turn below.

## A. Exclusion of Prospective Juror

### 1. Background

Spencer contends that the trial court erroneously dismissed prospective juror C-67 (Juror C-67) and that the error requires the judgment of death to be set aside. The trial court dismissed Juror C-67 for cause owing to his views on capital punishment. Indeed, Juror C-67 expressed strong — though not absolute — views on the death penalty in both the jury questionnaire and during oral examination. In the questionnaire, Juror C-67 gave the following responses to questions designed to gauge his attitude on capital punishment:

> "Q50. Do you have any personal, philosophical, moral or religious beliefs that would affect in some way your ability or willingness to serve as a juror in this case?
> A. I don't know. Religiously I would find it very difficult to ask for death sentence.
>
> "Q120. What are your general feelings regarding the death penalty?
> A. I have a religious bias against the death penalty.
>
> "Q121. Which would you say most accurately states your views regarding the death penalty?

10

A. [Juror checked the boxes indicating 'Strongly against' and 'Moderately against' and wrote the word 'to' in between the boxes.]

"Q122. What are the reasons you either support or oppose the death penalty?
A. It is irreversible. I prefer life without parole, even castration, to death.

"Q132. If a defendant was found guilty of intentional, deliberate first degree murder and at least one of the 'special circumstances' was found to be true, would you always vote for Life Without the Possibility of Parole, and reject Death, regardless of the evidence presented at the penalty phase of the trial?
A. [Juror checked the 'No' box.]

"Q142. Do you feel the death penalty should never be imposed for murder?
A. [Juror checked the 'No' box.]

"Q140. Under what circumstances, if any, do you believe that the death penalty is appropriate?
A. Perhaps torture or child victims.

"Q149. Given the fact that you will have two options available to you, can you see yourself, in the appropriate case, rejecting life in prison without the possibility of parole and choosing the death penalty?
A. I don't know. [Juror also circled the phrase 'in the appropriate case.']

"Q150. In a capital case, the factors in aggravation and mitigation upon which a penalty decision must rest are set forth in law which will be given the jury by the judge. Can you set aside any preconceived notions you may have about the death penalty, and make any penalty decision in this case based upon the law as it is given by the judge?
A. No. My true beliefs are not 'preconceived notions to be set aside.'

"Q155. Could you set aside your personal feelings, if any, and follow the law as the court explains it to you?
A. Yes, with the possible exception of the death penalty.

11

"Q163. Please mention anything which you believe may affect your ability to be a juror or which may affect your participation as a juror in this trial?
A. My reluctance about the death penalty."

Juror C-67 offered further insight into his views during oral examination. In person before the trial court, the judge and juror had the following exchange:

"Q. Do you think you would automatically vote for one of those penalties [life without the possibility of parole versus death] simply because you might favor it over the other one?
A. Well, in the questionnaire there were — there was a lot of discussion about the death penalty.
Q. Right.
A. And I suppose I have a lot of reservations about that, as my answers probably indicate.

"Q. All right. With your reservations about the death penalty in mind, do you think in a penalty-phase determination during deliberations, do you think you would always vote against the death penalty despite any aggravating or negative evidence that may have been presented?
A. I don't know. I've never had to be in that situation before.

"Q. All right. Let me ask you another assumption type of question. . . . Do you think you would always vote for life without parole and reject death despite any of this negative evidence that may have been presented during the course of trial?
A. Well, this is obviously the hardest single thing in that whole thing for me and I don't know.

"Q. All right. Let me ask you this: Assume that . . . in your own mind based on the evidence and the law you believe the death penalty is appropriate in this case, would you vote for it?
A. Well, if I believed the death penalty was warranted in the case then I would vote for it, but for me to believe that the death penalty is warranted is the whole issue.

"Q. Do you think the death penalty would ever be warranted in any kind of case?
A. Yes.

12

Q. Do you think that it would be possible for you to vote for the death penalty in a given case without going into what that case might be?
A. I can imagine things horrible enough to get me to vote for the death penalty, I suppose."

The trial judge then conducted a sidebar with the attorneys. The court ultimately found that Juror C-67 was "substantially impaired and would not be able to follow his oath as a juror in this case." The court acknowledged that the juror "can think of a situation where he could impose the death penalty, and, of course, we can't get into what that is." The judge noted, however, that Juror C-67 "thought a long time" before giving this answer. Immediately before finding Juror C-67 to be substantially impaired, the judge remarked, "If you go to Question 150, which is, you know, 'Can you set aside any preconceived notions that you have about the death penalty,' he says, 'No. My true beliefs are not preconceived notions to be set aside.' " Spencer's attorney urged that "that 150 answer [] may be worth further inquiry," to which the court replied, "I don't think it is, not based on what he said." The court thereafter stated for the record that he found Juror C-67 to be substantially impaired and excused the juror.

### 2. Analysis

The standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment was initially articulated by the United States Supreme Court. In *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*), the court held that such a juror may be excused if the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " In announcing this standard, the court clarified that — despite language contained in the earlier case of *Witherspoon v. Illinois* (1968) 391 U.S. 510, 515, fn. 9 — dismissal of a prospective juror may be proper even if the juror does not "'unambiguously" state

13

that he or she "would automatically vote against the imposition of capital punishment no matter what the trial might reveal." (*Witt, supra*, 469 U.S. at p. 424; see also, e.g., *Darden v. Wainwright* (1986) 477 U.S. 168, 175 [stating that *Witt* "modified" the court's opinion in *Witherspoon*]; *People v. Kaurish* (1990) 52 Cal.3d 648, 697 [noting that the high court's "position on death penalty exclusion was substantially modified in *Wainwright v. Witt*"].) The *Witt* court further explained that, because "many veniremen simply cannot be asked enough questions to reach the point where their bias [against the death penalty] has been made 'unmistakably clear,' " "deference must be paid to the trial court who sees and hears the juror." (*Witt, supra*, 469 U.S. at pp. 424–425, 426.) The high court has since "reinforced" this rule of deference. (*Uttecht v. Brown* (2007) 551 U.S. 1, 7 (*Brown*).) Thus, "[e]ven when '[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty,' the need to defer to the trial court remains because so much may turn on a potential juror's demeanor." (*Id.* at p. 8.)

California courts apply the same standard announced in *Witt* and its progeny in applying the corresponding provisions of the California Constitution. (E.g. *People v. Ghent* (1987) 43 Cal.3d 739, 767 (*Ghent*) [adopting the *Witt* standard]; *People v. Gray* (2005) 37 Cal.4th 168, 192 (*Gray*) ["We apply the same [*Witt*] standard under the state Constitution."].) Like the United States Supreme Court, we emphasize the deference owed to the trial judge, stating that "where equivocal or conflicting responses are elicited regarding a prospective juror's ability to impose the death penalty, the trial court's determination as to his true state of mind is binding on an appellate court." (*Ghent, supra,* 43 Cal.3d at p. 768.) Accordingly, in such situations where the trial court has had an opportunity to observe the juror's demeanor, we uphold the court's decision to excuse the juror

14

so long as it is supported by substantial evidence. (*People v. Martinez* (2009) 47 Cal.4th 399, 426–427 (*Martinez*); *People v. Zaragoza* (2016) 1 Cal.5th 21, 37–39 (*Zaragoza*).)

Applying this standard, we find the trial court did not err in excusing Juror C-67. Time and again, Juror C-67 expressed uncertainty as to whether he could set aside his personal antipathy to the death penalty and follow the law as instructed. For example, when asked in the questionnaire whether he could put aside his "personal feelings . . . and follow the law as the court explains it to you," the juror answered "Yes," but "with the possible exception of the death penalty." The juror also mentioned his "reluctance about the death penalty" as something which may affect his ability to be a juror or his participation as a juror in this trial. He further stated that he did not know whether he could choose the death penalty even "in the appropriate case." Twice more when probed by the court during oral examination about whether he "would always vote against the death penalty despite any aggravating or negative evidence that may have been presented," the juror answered "I don't know." Given the juror's own recognition that he did not know whether he could follow the law or ever vote for the death sentence, the trial court did not commit *Witherspoon*/*Witt* error when it found the juror was substantially impaired. (*People v. Wash* (1993) 6 Cal.4th 215, 255 (*Wash*) [finding no error in a trial court's decision to dismiss for cause when the venirewoman "consistently responded, 'I don't know' in answer to the question whether she was capable of voting for death"].)

Both this court and the United States Supreme Court recognize that "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases" — but only "so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176; see, e.g., *Martinez*, *supra,* 47

15

Cal.4th at p. 431 [applying *Lockhart* to the facts of the case].)  In this context, the crucial aspect of the trial court's interaction with Juror C-67 was not the juror's "reluctance about the death penalty," but instead the absence of a clear statement from the juror regarding his willingness and ability to temporarily set aside his personal beliefs, if necessary, to follow the law's requirements.  In answering question 150 on the questionnaire, which asked whether the juror could suspend "any preconceived notions you may have about the death penalty, and make any penalty decision in this case based upon the law as it is given by the judge," the juror wrote, "No.  My true beliefs are not 'preconceived notions to be set aside.' "  Spencer argues that the juror's answer merely expressed umbrage at his beliefs being called "preconceived notions."  That is one interpretation of the answer, but not one the trial court was required to adopt.  After considering the juror's other in-person responses, his demeanor, and the full text of question 150 (which prefaces the inquiry with the explanation that "a penalty decision must rest . . . in law"), the trial judge could have fairly interpreted the prospective juror's answer to question 150 as conveying that he was not willing to set aside his beliefs to the extent required by law.  In light of the record, we see no basis to conclude the trial court erred when it decided that Juror C-67's views would prevent or substantially impair the performance of his duties.  (*Witt*, *supra*, 469 U.S. at p. 434 ["the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record"].)

Despite ample evidence supporting the trial court's decision, Spencer nonetheless contends that Juror C-67's excusal was improper because the juror did not categorically reject the possibility of imposing death.  Spencer argues that because Juror C-67 "recognized there were cases where the death penalty was warranted and . . . could imagine himself imposing such a punishment," he was not substantially impaired.  We find otherwise.

16

A trial court may properly infer a prospective juror's commitment to perform the juror's role with integrity, even where some equivocation is initially present. (See *People v. Stewart* (2004) 33 Cal.4th 425, 447 (*Stewart*) [describing a qualified juror as someone who may initially express hesitation about imposing the death penalty and "yet, in response to brief follow-up questioning, persuasively demonstrate an ability to put aside personal reservations, properly weigh and consider the aggravating and mitigating evidence, and make that very difficult determination concerning the appropriateness of a death sentence"].) Nonetheless, the proper inquiry in determining whether *Witherspoon/Witt* error occurred is not whether some evidence exists that the prospective juror could vote for the death penalty. The standard is instead whether substantial evidence exists to support the trial judge's determination that the juror was substantially impaired in terms of his ability to do so. The record provides support for the trial court's decision. So, the fact that Juror C-67 also gave some responses indicating that he would not automatically vote against the death penalty is not grounds for reversing the death judgment. (*Martinez, supra*, 47 Cal.4th at pp. 431–432 ["When a prospective juror has made statements that tend to support the trial court's conclusion that the juror is not qualified, 'the fact that the juror also gave statements that might have warranted keeping [him] as a juror does not change the conclusion' that substantial evidence supports the trial court's ruling." (internal alteration marks omitted)].)

Indeed, the specific answers from Juror C-67 on which Spencer hinges his argument do not change the overall equivocal nature of the juror's responses. Consider, for instance, the juror's answer that "I can imagine things horrible enough to get me to vote for the death penalty, I suppose." The response, coming only after Juror C-67 averred more than once that he did not know whether he could follow the court's instructions, was itself qualified and uncertain. The

17

venireman "suppose[d]" he could "imagine" scenarios where he would vote for death.  While the trial court felt it could not "get into what" those scenarios were, the juror's questionnaire answer indicated that they involved circumstances not present at Spencer's trial — those featuring "torture or child victims."  The prosecution had withdrawn the torture special circumstance allegation before jury selection began, and the sole murder victim, age 35 when he died, was not a child.  To excuse the juror under such circumstances does not constitute *Witherspoon*/*Witt* error.  (*People v. Jones* (2017) 3 Cal.5th 583, 615 [affirming the excusal of a prospective juror for cause when the juror "articulated only a single hypothetical situation in which he could see himself voting for the death penalty . . . and that hypothetical situation was not applicable in this case"]; *People v. Tate* (2010) 49 Cal.4th 635, 666 (*Tate*) ["a prospective juror may be excused if his or her views on capital punishment would cause him or her invariably to vote either for death, or for life, in the case at hand"].)

The equivocality of prospective jurors' responses may be further compounded by their demeanor, which trial judges can readily observe.  (*Witt*, *supra*, 469 U.S. at p. 428, fn. 9 [" '[The] manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.  That is seen below, but cannot always be spread upon the record.' "]; *Stewart*, *supra*, 33 Cal.4th at p. 451 ["a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record"].)  In this case, the record affirmatively discloses that Juror C-67's demeanor contributed to the trial court's decision to excuse him for cause.  In discounting Juror C-67's answer that he "could imagine things horrible enough to get [him] to vote the death penalty" — a crucial response on which Spencer rests his case — the court noted that Juror

18

C-67 "thought a long time" before giving that answer. (See *People v. Abilez* (2007) 41 Cal.4th 472, 498 [finding that "the trial court was well within its broad discretion" when it excused a juror for cause based on the juror's answers and "[m]ore significantly" her hesitation before answering].)

We defer to trial courts when they dismiss potential jurors based on their equivocation and demeanor. (E.g., *Zaragoza*, *supra*, 1 Cal.5th at p. 42 ["We defer to the trial court's resolution of these conflicting responses, because that court had the opportunity to assess the juror's tone, apparent level of confidence, and demeanor."]; *People v. Moon* (2005) 37 Cal.4th 1, 15–16 [deferring to the trial court's evaluation of a prospective juror's state of mind when the juror "was less than consistent in her answers"]; *Gray*, *supra*, 37 Cal.4th at p. 194 ["In light of her equivocal answers on voir dire, we defer to the trial court's implicit determination regarding Juror C.B.'s state of mind and conclude substantial evidence supports the court's ruling . . . ."].) Indeed, we have upheld such a decision even when a prospective juror gave responses somewhat more indicative of her willingness to vote for the death penalty than what Juror C-67 provided. (*Martinez*, *supra*, 47 Cal.4th at pp. 427–430, 433, 466 [affirming the decision to dismiss a juror who, among other things, stated "I have some very strong views against the death penalty. And I feel I could listen to the evidence and make a determination based on the evidence"].)

Finally, although trial courts have a responsibility to probe ambiguous juror responses that may initially evince a reluctance to consider imposing the death penalty (e.g., *Stewart*, *supra*, 33 Cal.4th at pp. 445–447), the court here made a meaningful effort to engage with the questions raised by Juror C-67's responses. Given the circumstances of this case, we reject Spencer's assertion that the trial court had an obligation to engage in even "further questioning, as defense counsel suggested" to the extent that Juror C-67's answers revealed lingering ambiguity.

19

While it is true that "[i]f the trial court remained uncertain as to whether [a venireman's] views concerning the death penalty would impair his ability . . . the court [i]s free . . . to follow up with additional questions" (*People v. Heard* (2003) 31 Cal.4th 946, 965), it is not true that, once the court has formed a definite impression, it still must ask more questions. (See *Witt*, *supra,* 469 U.S. at pp. 424–425 [noting that "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear' "]; *Brown*, *supra*, 551 U.S. at p. 8 [reiterating that excusal of a juror may be appropriate even when " '[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty' "]; *Tate*, *supra*, 49 Cal.4th at p. 678 [finding that the trial court did not err by denying the defense's request for further questioning when "the court could reasonably conclude that further voir dire would not change its impression of [the prospective juror's] state of mind"].)

We find the trial court did not commit *Witherspoon*/*Witt* error. Because the record supports the conclusion that a trial court could reasonably conclude Juror C-67 was substantially impaired, the trial court did not err in dismissing the prospective juror.

## B. Probable Cause to Arrest

### 1. Background

Spencer complains the police lacked probable cause to arrest him and, as such, the trial court erred in refusing to suppress his confession as the unlawful "fruit" of his purportedly illegal arrest. To address this argument, we survey the facts known to the San Jose Police Department at the time its officers apprehended Spencer.

By the time the police arrested Spencer, they had taken into custody Silveria, Travis, and Rackley. From the search of the vehicles that Silveria and Travis were driving when arrested, officers recovered large sums of cash, duct tape, and a stun gun. They had also identified Rackley and Jennings as suspects in robberies at the Gavilan Bottle Shop and another location involving the use of a stun gun.

Upon being arrested, Silveria offered to help the police track down Jennings and Spencer, the remaining suspects at large whose names the police already knew through the tip provided by Cynthia and the investigation done by Officer Hyland. At a motion hearing conducted some months before the beginning of trial, Sergeant George McCall, the police officer who took the call when "Cynthia" phoned the station the evening of January 28, 1991, testified. He stated that the caller indicated the suspects were driving a Dodge Charger, and they said they "were going to be leaving town and they were going to pull another robbery that night." She also provided a last name of "Silveras" or "Silveria" for "Danny."

Sergeant McCall passed the information along to Detective Boyles and Officer Hyland. Detective Boyles then spoke to Cynthia. Detective Boyles testified that Cynthia provided a last name of Jennings for Matt and Silveria for Danny during this conversation. She also provided Jennings's address and said Jennings was driving a vehicle that was possibly a Charger.

Officer Hyland corroborated crucial details from Cynthia's account when he went to the suspects' residences. For instance, one of Jennings's brothers informed Officer Hyland that Jennings, Rackley, Travis, Silveria, and Spencer hung out as a group and that Jennings had packed a suitcase and left with the others. The brother also confirmed that Spencer had a Charger. Silveria's brother likewise told the officer that Silveria had packed a suitcase and left. So Officer

21

Hyland's work revealed that Silveria, Travis, Rackley, Jennings, and Spencer hung out as a group, and that members of the group had packed suitcases and left with one another.  These facts matched the information provided by Cynthia — including her information that the group was planning to skip town.

When Silveria was arrested, he further cooperated with law enforcement. He contacted Jennings, then directed the officers to the apartment where Jennings and Spencer were staying and pointed out Spencer's newly acquired vehicle to them.  The police then arrested Spencer when he and Jennings arrived back at the apartment together.

## 2. *Analysis*

Probable cause to arrest exists where facts known to the arresting officer would be sufficient to persuade a person of "reasonable caution" that the individual arrested committed a crime.  (*People v. Celis* (2004) 33 Cal.4th 667, 673.)  Information provided by an anonymous informant can constitute a sufficient basis for finding probable cause — but only when "the informant's statement is reasonably corroborated."  (*Jones v. United States* (1960) 362 U.S. 257, 269.)  In examining whether police obtained such reasonable corroboration of an informant's tip, we apply a totality of the circumstances determination in which an informant's " 'veracity,' " " 'reliability,' " and " 'basis of knowledge' " are "relevant considerations."  (*Illinois v. Gates* (1983) 462 U.S. 213, 230, 233 (*Gates*).)  An informant's veracity or reliability may be established by her having provided tips that proved true.  (See, e.g., *Draper v. United States* (1959) 358 U.S. 307, 309 (*Draper*) [noting that the informant Hereford "from time to time gave information to [agent] Marsh regarding violations of the narcotic laws . . . [and] Marsh had always found the information given by Hereford to be accurate and reliable"].)  An informant's basis of knowledge — the grounds upon which the

22

informant believes or knows something to be true — is also important, since the tip supplied is more trustworthy if the informant has first-hand knowledge of the criminal activity. (See, e.g., *Gates*, *supra*, 462 U.S. at pp. 277–280 [discussing various cases where the court focused on whether the informant spoke with personal knowledge].) What the court in *Gates* clarified, however, is that "veracity," "reliability," and "basis of knowledge" are not rigid, "independent requirements" which must all be present. (*Id.* at p. 230.) The focus instead is on the "overall reliability" of the informant's tip. (*Id.* at p. 233.)

In this case, information known to Detective Boyles and Officer Hyland at the time of Spencer's arrest would indeed likely persuade someone " 'of reasonable caution in the belief' " to conclude Spencer had committed a felony. (*Wong Sun v. United States* (1963) 371 U.S. 471, 479.) During her first call to the police, Cynthia informed Detective Boyles that "Danny, John, Matt, Chris and Troy" were perpetrators of the stun gun robberies. Detective Boyles already knew that Matthew Jennings and Troy Rackley — individuals identified by their full names — were suspects. The detective thus was immediately able to corroborate part of Cynthia's information. Cynthia later also provided some of the suspects' last names — Silveria for "Danny" and Jennings for "Matt" — and so solidified the fact she had accurately named at least one person known to the police to be a suspect (Matthew Jennings).

Further corroboration of Cynthia's information emerged from Officer Hyland's subsequent investigation. By speaking with the suspects' family members, Officer Hyland confirmed that they indeed hung out as a group, and that some of them had packed suitcases and left with others in the group. While these details may seem trifling, they lend credence to Cynthia's tip that the men committed the robberies together and were planning to leave town. As "innocent behavior frequently will provide the basis for a showing of probable cause," the

23

pertinent question is not whether the activities corroborated by the police are criminal in nature but rather, "the degree of suspicion that attaches to particular types of noncriminal acts." (*Gates*, *supra*, 462 U.S. at p. 244, fn. 13; see also, e.g., *Draper*, *supra*, 358 U.S. 307 at pp. 312–313 [a "classic case on the value of corroborative efforts of police officials" (*Gates*, *supra*, 462 U.S. at p. 242) where the court affirmed that the police had probable cause even though all the details corroborated from an informant's tip were of innocuous behavior]; *People v. Costello* (1988) 204 Cal.App.3d 431, 446 ["Even observations of seemingly innocent activity suffice alone, as corroboration, if the anonymous tip casts the activity in a suspicious light."]; *People v. Ramirez* (1984) 162 Cal.App.3d 70, 73–75 [same].)

That the five men hung out as a group is an innocent detail. It nonetheless takes on a suspicious cast in light of Cynthia's information linking all five together as stun-gun robbers, and the knowledge that two of them were already suspects. (See *People v. Medina* (1985) 165 Cal.App.3d 11, 19–20 [finding it "inappropriate to conduct a piecemeal examination" of an informant's tip on different suspects "when the informant's information linked these suspects and their houses together and this link was also corroborated" (italics omitted)].) Likewise, that the men were planning to leave town is a corroborated piece of information "relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." (*Gates*, *supra*, 462 U.S. at p. 245.) This last piece of information — along with the nugget that the men "were going to pull another robbery" on the same night Cynthia contacted the police — imparted an urgency to the police investigation and, given the rest of the corroborated details, gave rise to a fair inference that Cynthia gleaned her information "either from the [suspects themselves] or someone they trusted." (*Id.* at p. 246.) So the details corroborated go beyond mundane facts that remain

24

innocuous even in light of a tip. (Contra *People v. Fein* (1971) 4 Cal.3d 747, 752–753 [finding no probable cause when the police corroborated only the "defendant's first name, his presence at the apartment, and the presence of the [defendant's vehicle]"].)

By the time Silveria, Travis, and Rackley were under arrest, then, the police had verified sufficient details of Cynthia's tip to render them reasonably persuaded that she was right about some things and so was " 'probably right about other facts.' " (*Gates*, *supra*, 462 U.S. at pp. 244–245 [stating that such an inference "suffices for the practical, common-sense judgment called for in making a probable-cause determination"]; *People v. Medina*, *supra*, 165 Cal.App.3d at p. 18 [" 'corroboration of information to establish the veracity of the informer . . . is based on the premise that if it can be shown that part of the information provided by an informer is correct, this gives credibility to the remainder of the information' "].) Such "other facts" include, in this context, Cynthia's claim about Spencer's involvement in the robberies.

The evidence recovered from the initial arrests further enhanced Cynthia's credibility. From a search of Silveria's and Travis's vehicles, the police recovered substantial sums of cash and a stun gun — evidence highly corroborative of the tip that the men committed robberies with the use of such a weapon. Silveria then directed the officers to Jennings and Spencer's location and pointed out Spencer's new car, a purchase that looks suspicious given the tip that Spencer had participated in robberies in which the perpetrators got away with cash. The officers then arrested Spencer when he arrived back at the apartment with Jennings.

Taking into account the totality of these circumstances, we conclude that the arrest was made with probable cause, and the trial court did not err when it refused to suppress Spencer's confession on this basis. Nothing Spencer says

25

persuades us otherwise. Spencer argues that Cynthia was not a "citizen-informant" and therefore the information she provided could not be treated as "presumptively reliable." (See *Gates*, *supra*, 462 U.S. at pp. 233–234 ["if an unquestionably honest citizen comes forward with a report of criminal activity — which if fabricated would subject him to criminal liability — we have found rigorous scrutiny of the basis of his knowledge unnecessary"]; *People v. Hogan* (1969) 71 Cal.2d 888, 890–891; *Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 575–576.) Yet whether or not Cynthia fits the precise parameters of a citizen informant is immaterial to our analysis. Neither we nor the police *presumed* her information to be reliable. Instead the police substantiated her tip — and garnered sufficient corroboration to establish a substantial basis for crediting her information. That proves sufficient. (*Gates*, *supra*, 462 U.S. at pp. 244–245 ["It is enough, for purposes of assessing probable cause, that '[corroboration] through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.' "].)

## C. Necessity of *Miranda* Readvisement

### 1. *Background*

Spencer next argues that, even if he had been lawfully arrested, his confession to Madden's murder must be suppressed because Sergeant Keech did not advise him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Spencer concedes that Detective De La Rocha — who interrogated him about the robberies — advised him of his rights and that he knowingly and intelligently waived those rights. He thus concedes that the confession to the robberies "would stand on its own." Nonetheless, he contends that Sergeant

26

Keech was under an obligation to readvise him of his *Miranda* rights when he interrogated him about the murder.

Spencer does not dispute that less than five hours passed between the time when he waived his *Miranda* rights and when Sergeant Keech began his interrogation. He also does not dispute that the following exchange took place after Sergeant Keech introduced himself and his partner:

"Keech:     We're from Santa Clara Police Department. Okay, uh, I understand you already talked to one of the San Jose detectives. Is that correct?

"Spencer:     Yes, I have.

"Keech:     Okay. And I understand you . . .

"Spencer:     I've admitted to being involved in a robbery.

"Keech:     Okay. And he read you, uh, your rights?

"Spencer:     Yes.

"Keech:     Did you understand your rights?

"Spencer:     Yes.

"Keech:     Okay. And you waived your rights.

"Spencer:     Yes."

After some further back and forth which, when transcribed, took about a page, Sergeant Keech started the questions bearing on the murder. The sergeant asked, "Where did you spend the night last night? First of all, you understand your rights. You're willing to talk to us. Is that correct?" to which Spencer answered, "Yes." The interrogation continued apace from there, with Spencer eventually confessing to participating in the robbery and stabbing Madden multiple times on the way out the door. After getting the details to the crime,

27

Sergeant Keech once more brought up the *Miranda* rights. Spencer again confirmed he was read "[his] Miranda rights," that "I know my Miranda rights," and that he understood those rights. The interrogation terminated shortly thereafter.

2. *Analysis*

Where a subsequent interrogation is " 'reasonably contemporaneous' " with the prior waiver, and the prior waiver was "knowing and intelligent," police need not undertake a *Miranda* readvisement. (*People v. Mickle* (1991) 54 Cal.3d 140, 170 (*Mickle*).) In determining whether a subsequent interrogation is reasonably contemporaneous, we consider the totality of the circumstances. Relevant considerations include: "1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that the defendant subjectively understands and waives his rights." (*People v. Smith* (2007) 40 Cal.4th 483, 504 (*Smith*).)

We conclude that the subsequent interrogation conducted by Sergeant Keech and his partner was indeed reasonably contemporaneous with Spencer's waiver of his *Miranda* rights. Only five hours had passed between the time of the waiver and the interrogation; there was no change in the location of the interrogation and Spencer remained in custody in the interim; Sergeant Keech officially reminded Spencer of his prior advisement; and Spencer unambiguously indicated that he understood the advisement and waived his rights.

Under similar circumstances, this court has more than once found that a *Miranda* readvisement is not required. In *Mickle*, *supra*, 54 Cal.3d at p. 171, for instance, we held that that no *Miranda* violation occurred when, among other

28

things, the subsequent interrogation took place 36 hours after the last advisement, the suspect remained in official custody, and "[n]othing in the record indicate[d] that defendant was mentally impaired or otherwise incapable of remembering the prior advisement and deciding to answer a few more questions." Likewise, in *Smith*, *supra*, 40 Cal.4th at pp. 504–505, we ruled that no readvisement was necessary when the second interrogation occurred "less than 12 hours after the first interrogation ended," the defendant remained in custody, and "[t]he same officers conducted the interrogation, in the same office, and asked defendant whether he remembered the *Miranda* warnings." We came to the same conclusion in *People v. Williams* (2010) 49 Cal.4th 405, 435 (*Williams*), in which we determined that the second interrogation — "having occurred approximately 40 hours later in the same location as the first, and was conducted by one of the previous interrogators" — was reasonably contemporaneous with the waiver.

True: not all of the relevant factors tend to cut in the People's favor. In particular, different officers interrogated Spencer about the murder and the robberies, and Spencer — 21 years old at the time and having an " 'insignificant record of criminal conduct' "[3] — can be presumed not to have much "sophistication or past experience with law enforcement." (*Smith*, *supra*, 40 Cal.4th at p. 504.) Nonetheless, we find that these factors do not persuade us to a different conclusion.

The *Miranda* court itself confronted a situation in which two different law enforcement authorities interrogated a suspect for two different crimes. What it concluded is that "[a]lthough the two law enforcement authorities are legally distinct and the crimes for which they interrogated [defendant] Westover were different, the impact on him was that of a continuous period of questioning."

---

[3]     The prosecution noted that at the time of his arrest, Spencer had four prior misdemeanor convictions and three jail sentences.

(*Miranda*, *supra*, 384 U.S. at p. 496; see also *People v. Pettingill* (1978) 21 Cal.3d 231, 245 [observing in a different context that "the large majority of suspects . . . see the uniform only as a symbol of police authority, [and] neither know nor care about the precise jurisdictional competence of their interrogators"].)  Of course, the "continuous period of questioning" in *Miranda* meant that the failure to provide the necessary advisement at the first interrogation tainted the subsequent questioning — during which warnings were given.  (*Miranda*, *supra*, 384 U.S. at p. 496.)  Yet the same logic runs in reverse, at least barring a gap in time between portions of the interrogation sufficiently long to establish that the second segment should be treated as an entirely separate session.  (Accord *People v. Duff* (2014) 58 Cal.4th 527, 555 ["We have permitted as 'reasonably contemporaneous' the resumption of interrogation without a readvisement even a day or two after the initial waiver."].)  Here, Spencer was advised of his rights at the initial interrogation by Detective De La Rocha of the San Jose Police Department, and was later reminded of them by Sergeant Keech of the Santa Clara Police Department.  Despite the fact these departments are legally distinct and "the crimes for which [the officers] interrogated" Spencer were different (*Miranda*, *supra*, 384 U.S. at p. 496), Sergeant Keech's interrogation may be reasonably contemporaneous with Detective De La Rocha's questioning.  Readvisement therefore was unnecessary.

This conclusion is not affected by Spencer's youth or the fact that his criminal record consisted only of misdemeanors.  (See *People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1089 [ruling that the police were not obligated to readvise an 18-year-old suspect with an 11th grade education even though the record does not establish whether the suspect's "juvenile proceedings gave him experience with *Miranda* warnings"].)  Moreover, the importance of Spencer's relative inexperience and the different identities of his interrogators is overshadowed by

the presence of clear indicia that Spencer understood his *Miranda* rights — and chose to waive them.

At the beginning of the interrogation, Sergeant Keech not only reminded Spencer of his prior *Miranda* warnings, but also confirmed Spencer understood and waived his rights. Before asking Spencer about the circumstances surrounding the murder, the Sergeant again asked whether Spencer understood his rights and was willing to talk — to which Spencer again unambiguously answered yes. Finally, near the end of the interview — when Sergeant Keech once more brought up the *Miranda* warnings — Spencer repeated some of the rights verbatim back to the officer. While a belated advisement cannot render admissible a prior confession, we do not think that this exchange constitutes an after-the-fact *Miranda* warning. Rather, coming at the end of the interview, the exchange confirms that Spencer knew his rights throughout the interrogation and waived them when he willingly talked to the officers.

Taking into account the totality of relevant circumstances, we find the officers interrogating Spencer on Madden's murder were not required to readvise him of his *Miranda* rights.

**D. Voluntariness of Confession**

*1. Background*

Separate from his *Miranda*-focused argument, Spencer contends that his confession was involuntary. His argument is based on a long statement Sergeant Keech made, laying out what he believed happened the night Spencer and his cohort killed Madden. After giving the facts of the case as he believed them to be, Sergeant Keech exhorted Spencer to tell his "side of the story." The Sergeant continued, "You don't take this chance right now, you may never get it again. And if you don't think I can't prove this case, if you don't think I can't fry you,

31

you're sadly mistaken, Chris. Now, don't let these guys lay it all on you 'cause that's what's happening. You get a chance to lay some back and say exactly what happened. Whose idea was it?"

Spencer responded by attempting to negotiate. The attempt was cut short by Sergeant Keech, who said, "If you tell me the whole story, it's because you want to tell me the whole story." After some inaudible comments, the Sergeant reiterated, ". . . don't ask me to make you any promises. I can't make you any promises, Chris. All I can tell you is that I'll put this down as accurately as you tell me what, what really happened, and that'll be your story." At this point, the interrogation proceeded with Spencer providing many of the details about what happened the night of Madden's murder and the morning after.

Towards the end of the interview, Sergeant Keech asked Spencer a series of questions regarding the statement Spencer just gave.

> "Keech:      The statement that you gave us tonight, was that free and voluntarily given?
>
> "Spencer:    Yes.
>
> "Keech:      Did we make you any promises?
>
> "Spencer:    No.
>
> "Keech:      Did we coerce you in any way?
>
> "Spencer:    What does that mean?
>
> "Keech:      Did we threaten you?
>
> "Spencer:    [Laughs] No."

  2. *Analysis*

Spencer is of course correct that "[a]n involuntary confession may not be introduced into evidence at trial." (*People v. Carrington* (2009) 47 Cal.4th 145,

169 (*Carrington*).)  In determining whether a confession is involuntary, we consider the totality of the circumstances to see if a defendant's choice to confess was not " 'essentially free' " because his will was overborne by the coercive practices of his interrogator.  (*Ibid.*)  We have found a confession not "essentially free" when a suspect's confinement was physically oppressive, invocations of his or her *Miranda* rights were flagrantly ignored, or the suspect's mental state was visibly compromised.  (*People v. Neal* (2003) 31 Cal.4th 63 (*Neal*); *People v. McClary* (1977) 20 Cal.3d 218 (*McClary*); *People v. Hogan* (1982) 31 Cal.3d 815 (*Hogan*).)  We are not persuaded the circumstances of Spencer's interrogation are comparable.

We begin by noting certain factual predicates missing from Spencer's involuntariness claim.  Spencer makes "no claim of physical intimidation or deprivation" and "no assertion of coercive tactics other than the contents of the interrogation itself."  (*People v. Holloway* (2004) 33 Cal.4th 96, 114 (*Holloway*).)  (Contra *Neal*, *supra*, 31 Cal.4th at p. 84 [a case in which we held the confession involuntary, in part, because the defendant "was placed [overnight] in a cell without a toilet or a sink," "did not have access to counsel or to any other noncustodial personnel," "was not taken to a bathroom or given any water until the next morning," and "was not provided with any food until some time following the third interview, after more than 24 hours in custody and more than 36 hours since his last meal"].)  Nor does Spencer dispute that, prior to the interview by Sergeant Keech, he received *Miranda* warnings and waived his rights.[4]  (See *Holloway*, *supra*, 33 Cal.4th at p. 114 [a voluntary confession case where suspect was "fully advised of his rights and voluntarily waived them"]; *Williams*, *supra*, 49 Cal.4th at p. 442 [another voluntary confession case where "Defendant understood his right

---

[4]     Spencer does argue that he should have been readvised of those rights by Sergeant Keech, but we have rejected that claim.

33

to counsel and to remain silent, but waived those rights"].) (Contra *People v. Hinds* (1984) 154 Cal.App.3d 222, 230–231 [a case of coercion in which the detective "spoke softly and indistinctly" while reading the defendant his *Miranda* rights and did not ask if the defendant wished to waive his rights].) Despite his advisement, Spencer did not attempt to invoke any of these rights during the interview. (Contra *Neal*, *supra*, 31 Cal.4th at p. 74 [the suspect invoked both his right to remain silent and his right to counsel — the latter " ' probably' '7 to 10 times' " — only to be deliberately ignored so that the detective could "obtain a statement"]; *McClary*, *supra*, 20 Cal.3d at pp. 222–226 ["The People concede that the officers violated defendant's *Miranda* rights when they ignored her repeated requests for an attorney to assist her . . . ."].) These missing elements distinguish Spencer's case from those where we have found the confession to be involuntary. (See *People v. Winbush* (2017) 2 Cal.5th 402, 454 (*Winbush*) ["This flagrant violation of *Miranda* weighed heavily in our conclusion that the interrogation [in *Neal*] was coercive."]; *Holloway*, 33 Cal.4th at p. 117 [distinguishing *McClary* where "we have no such insistent overriding of a defendant's invocation of rights, no false representation regarding the death penalty, and no promise of a particular charge or other particular lenient treatment in exchange for cooperation"].)

We also find significant Sergeant Keech's conduct, and Spencer's response to it. While Sergeant Keech confronted Spencer and gradually gleaned from him ever more incriminating details, the record does not indicate that the officer made vituperative statements. The officer engaged in no name-calling, no obvious strong-arm tactics, and no base appeals to Spencer's deeply held beliefs. (Contra *People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1468, 1478, 1485–1486 [a case in which the police officers "got in [the defendant's] face," "yelled," "screamed," "made accusations about him not being a man or not having any balls," and "appealed to his manhood, his religion, and his Hispanic heritage"].) For his part,

34

Spencer gave coherent, responsive answers and did not appear excessively fearful or distressed. (See *Carrington*, *supra*, 47 Cal.4th at p. 175 [a case where we found the confession to be voluntary because, among other things, "[t]here is no indication that defendant was induced by fear to make a statement. She appeared lucid and aware throughout the entire interrogation session and never asked the police officers to terminate the interview. Defendant spoke with confidence, and her answers were coherent"].) (Contra *Hogan*, *supra*, 31 Cal.3d at p. 828 [an involuntary confession case in which the defendant gave a statement while "sobbing," "weeping" and "eventually [becoming] so upset that he vomited"].) Spencer also had the wherewithal to articulate — time and again — a version of events that minimized his involvement. Along the way, he changed his story from one emphasizing that he knew nothing about the offense, to one admitting he was at the scene but maintaining he had not participated in the killing, to finally admitting that he stabbed the victim. (See *Williams*, *supra*, 49 Cal.4th at pp. 442, 444 [crediting the fact that "defendant continued to deny responsibility in the face of the officers' assertions" as evidence that the defendant's will was not overborne].)

In addition, Spencer acknowledged at the end of the interview that his confession was "free and voluntarily given." He confirmed that the officers made him no promises and that they did not threaten him. Indeed, he was comfortable enough so that he could laugh when responding "no" to the question whether he was threatened.

Given these circumstances, we do not find a basis here to conclude that the interrogation techniques Spencer complains of amounted to coercion. These complained-of tactics include "repeated expressions that appellant was lying, an implication that the death penalty would be imposed, fabricated evidence against appellant, and implied promises of leniency" in combination with "appellant's

physical state and personal characteristics." That Sergeant Keech told Spencer, even repeatedly, that "the police knew he was lying about the extent of his involvement" does not rise to the threshold necessary to taint the interrogation as unlawful. Spencer did lie — artlessly — and the sergeant confronted him with inconsistencies in his story. This is not an improper interrogation technique, as an interrogation may include " 'exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect.' " (*Holloway*, *supra*, 33 Cal.4th at p. 115.)

Insofar as Spencer is suggesting that Sergeant Keech engaged in impermissible tactics amounting to "brainwashing" when laying out a narrative of what he believed happened on the night of Madden's murder, we note it was Spencer himself who supplied many of the details. An example: while Sergeant Keech stated that Spencer and his coconspirators got to Leewards early and waited to ambush Madden, Spencer added the fact that he and his friends had waited about "two, two and a half hours" until Madden exited the building and that, while waiting, he saw janitors who drove a "white van" and were "waxing the floors." On the more crucial aspects of the crime, Spencer, again, confessed to details not suggested by Sergeant Keech. For instance, after much prevarication, Spencer admitted that he stabbed Madden "[t]hree or four times" before handing the knife to Travis. Sergeant Keech, in contrast, advanced the theory that Spencer "and Danny and John, you guys, all three of you, stabbed that dude" without suggesting the order in which each perpetrator stabbed Madden or how many times they did it.

Sergeant Keech's "outline of theories of events" did not come near the kind of scenario that was the basis for our finding of unconstitutional "brainwashing" in a previous case. (*Holloway*, *supra*, 33 Cal.4th at p. 115.) In *Hogan*, *supra*, 31 Cal.3d at p. 843, we acknowledged that coercion may include " 'the brainwashing

36

that comes from repeated suggestion and prolonged interrogation.' " What the police had done in *Hogan*, however, was to "repeatedly suggest[] to appellant that he was unquestionably guilty and that he suffered from mental illness." (*Ibid*.) Moreover, "[t]he question of appellant's mental illness" was not only "raised by the interrogating officers" but also "reinforced by appellant's wife and her communication to him that yet another police officer thought he had gone berserk and committed the homicides." (*Ibid*.) These suggestions, combined with prolonged interrogations, resulted in the defendant himself eventually expressing doubts as to his own sanity. (*Id.* at pp. 835–838.) No circumstance suggesting that such a brainwash occurred presents itself here.

We likewise dispose of the rest of Spencer's arguments regarding Sergeant Keech's conduct in the interrogation room. Although Sergeant Keech brought up the death penalty — remarking that "if you don't think I can't fry you, you're sadly mistaken" — the statement was made in isolation and Spencer did not appear cowed by the remark. In any event, " 'a confession will not be invalidated simply because the possibility of a death sentence was discussed.' " (*Holloway*, *supra*, 33 Cal.4th at p. 115–116 [finding the confession voluntary despite the detective stating "We're talking about a death penalty case here"]; *Williams*, *supra*, 49 Cal.4th at pp. 437–438 [same, despite the detectives referring to the "gas chamber" more than once].) Instead, a constitutional violation will be found "only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a 'promise [of] leniency in exchange for the suspect's cooperation.' " (*Holloway*, *supra*, 33 Cal.4th at pp. 115–116.) Here, Sergeant Keech made no promise of leniency. Contrary to what Spencer argues, the Sergeant's suggestion that Spencer did not mean to kill the victim but only to "cut" him did not amount to an implied promise of leniency. (*Williams*, *supra*, 49 Cal.4th at p. 444 [holding that "the suggestions made by the

37

interrogating officers that defendant may not have been the actual killer, or may not have intended that the victim die" were a permissible interrogation tactic]; *Carrington*, *supra*, 47 Cal.4th at p. 171 [similar].) Indeed, Sergeant Keech expressly told Spencer that he "can't make [him] any promises" and that Spencer should not ask for them.

Along the same line, we find no error in Sergeant Keech's false representation that the police had found Spencer's fingerprints at the crime scene. (*People v. Farnam* (2002) 28 Cal.4th 107, 182 (*Farnam*) [stating that "[w]here the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted" and that "the deception concerning defendant's fingerprints was unlikely to produce a false confession"]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1241 [finding the confession admissible because "it does not follow that [falsely] telling a murder suspect in the course of questioning that his prints had been lifted from the neck of the homicide victim 'caused' him to confess"]; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124–125 [similar]; accord *Smith*, *supra*, 40 Cal.4th at pp. 505–506 [listing cases where "[c]ourts have repeatedly found proper interrogation tactics" both "intimidating and deceptive"].)

Finally, Spencer's "physical state" and "personal characteristics" do not strike us as sufficient bases to disturb the trial court's decision to admit his confession. (See *People v. Dykes* (2009) 46 Cal.4th 731, 753 (*Dykes*) [rejecting the defendant's claim that "his decision to confess was based upon his youth and his absence of experience with the criminal justice system" since "there was no indication of police exploitation of these circumstances"].) It is true that Spencer was coughing during the interrogation and stated that he had bronchitis. There is no evidence, however, that the cough diminished Spencer's mental faculties or made him especially vulnerable to Sergeant Keech's questioning. Indeed, the

activities that Spencer admitted to engaging in the night before and the morning of his arrest indicated a rather robust constitution; however bad his bronchitis may have been, it did not keep him from driving around with his friends, enjoying a night at a hotel, or going shopping for a new car, new clothes, and new shoes in the morning.

In light of this analysis and the circumstances of Spencer's interrogation, we conclude that his confession was voluntary.

## E. Propriety of Victim Impact Statements

### 1. Background

Four members of Madden's family gave victim impact statements at the penalty phase of the trial. In addition, three witnesses testified as to how Madden's wife received the news of his death. Spencer complains that the number of witnesses, the presentation of their testimonies, and the content of their statements were "excessive, irrelevant and highly prejudicial." In particular, he complains that too many witnesses discussed the impact of Madden's death on his wife; that they discussed too extensively the effect of his death on individuals who did not testify — including Madden's daughter, who was seven years old at the time of her father's death; that they talked about Madden's life at points in time far removed from his death; and that photographs of Madden should not have been introduced into evidence.

### 2. Analysis

Evidence relating to a murder victim's personal characteristics and the impact of the crime on the victim's family is relevant to show the victim's " 'uniqueness as an individual human being' " and thereby "the specific harm caused by the defendant." (*Payne v. Tennessee* (1991) 501 U.S. 808, 823, 825.) Under California law, such evidence is admissible as a circumstance of the crime

39

under section 190.3, factor (a).  (*People v. Edwards* (1991) 54 Cal.3d 787, 835; *People v. Russell* (2010) 50 Cal.4th 1228, 1264 (*Russell*).)  Victim impact statements are, by their nature, emotional.  They merit exclusion only if they constitute such "inflammatory rhetoric" as to elicit "purely emotional or irrational responses from the jury."  (*People v. Simon* (2016) 1 Cal.5th 98, 138 (*Simon*).)  We review a trial court's decision to admit victim impact evidence for abuse of discretion.  (*Ibid*.)

With the exception of the photographs, Spencer does not appear to have objected to the introduction of the victim impact evidence.[5]  To preserve a claim of error regarding the admission of evidence, a party must object to its admission.  (*People v. Pollock* (2004) 32 Cal.4th 1153, 1181 (*Pollock*)); *Simon*, *supra*, 1 Cal.5th at p. 139 [stating that it was "incumbent" upon the defendant "to monitor the victim impact evidence on an ongoing basis during the penalty phase and raise any specific objections at that time"].)  The absence of such an objection from Spencer forfeits any claim on appeal that the testimonies were erroneously admitted.

Even if Spencer had objected, his argument still fails on the merits.  The number of witnesses that testified in this case, the content of their testimonies, and the decision to admit four of the victim's photographs are all within the limits of what we found proper in prior cases.  In *Simon*, *supra*, 1 Cal.5th at pp. 135–139, for example, we affirmed the trial court's decision to allow six witnesses to give victim impact statements, which described "the nature of their relationships with the victims, how they learned about the crimes, and how the crimes impacted their lives."  This was precisely the nature of the testimonies offered in Spencer's case,

_____

[5]     Indeed, in raising an objection to the photographs, trial counsel stated, "I'm not going to bother to stand up and object to things that I know the law permits . . . ."

40

where family members testified about their relationship with the deceased, how they learned about his death (with Sissy's narrative given special emphasis through the testimonies of those who saw how she reacted to the news that her husband had died), and how his murder affected their lives. Like in *Simon*, the testimonies painted a picture of emotional devastation, "but that is to be expected when loved ones have been brutally murdered." (*Simon*, *supra*, 1 Cal.5th at p. 140.) And as in *Simon*, our independent review of the record indicates the evidence was not so emotional — even when accompanied with pictures (*id.* at pp. 135–136) — "that the trial court's failure to exclude it amounted to an abuse of discretion or rendered [the] trial fundamentally unfair." (*Id*. at p. 140.)

Focusing on the specific facets of the victim impact evidence Spencer challenges does not persuade us otherwise. Seven people offered victim impact statements in this case, with testimonies spanning about 73 pages. Spencer calls our attention to a case where the evidence introduced was more limited. While it is true that in *People v. Roldan* (2005) 35 Cal.4th 646, 732–733, only one family member testified and her "time on the stand was relatively short and subdued," Spencer advances no persuasive reason for why *Roldan* should be treated as setting the upper limit on victim impact evidence. Having reviewed the statements from four members of Madden's family and three unrelated persons who testified to Sissy's reaction upon learning of her husband's death, we believe the evidence — while somewhat cumulative — was not excessive. (See *Winbush*, *supra*, 2 Cal.5th at p. 464 [discussing cases where more than seven people offered testimony, which was found to be "not unfairly excessive"].)

Nor was it improper that the witnesses discussed the impact of the victim's death on their own lives, as well as the lives of other family members — irrespective of whether these family members themselves testified. (*People v. Panah* (2005) 35 Cal.4th 395, 495 ["There is no requirement that family members

41

confine their testimony about the impact of the victim's death to themselves, omitting mention of other family members."].)  No authority supports Spencer's suggestion that because somebody testified, others must not talk about the testifying person's experience.  The same goes for his contention that because somebody — like Madden's young child and aged great-grandmother — did not take the stand, the number of witnesses who may properly discuss the impact of the murder on those individuals must be kept to "at most, one."  Our precedent, in fact, is to the contrary.  (E.g. *Russell*, *supra*, 50 Cal.4th at p. 1265 ["Though the victims' wives did testify about the impact of their husbands' deaths on their families, we reject defendant's claims that the victims' children were precluded from providing testimony regarding their personal experiences resulting from the deaths of their fathers."]; *id.* at p. 1264 [finding no abuse of discretion in the trial judge's decision to allow at least two witnesses to talk about how a father's death affected his son Christopher even though Christopher himself did not take the stand].)

Spencer also contends Madden's family may testify only about events close to the time of his death.  We disagree.  (*People v. Garcia* (2011) 52 Cal.4th 706, 751–752 (*Garcia*) ["The People are entitled to present a ' "complete life histor[y] [of the murder victim] from early childhood to death." '  [Citation.]  Such evidence, which typically comes from those who loved the murder victim, shows 'how they missed having [that person] in their lives.' "].)  As long as the events relayed are not otherwise unduly prejudicial, they may include anecdotes culled from a lifetime of shared experiences between the victim and those he left behind. (*People v. Brown* (2004) 33 Cal.4th 382, 398 ["To the extent [those who give victim impact statements] also recollected past incidents or activities they shared with [the victim], their testimony simply served to explain why they continued to

be affected by his loss and to show the 'victim's "uniqueness as an individual human being" ' "].)

So too may a jury be shown pictures of the victim in happier times when it considers testimonies about the devastation brought about by his death. The prosecution here entered four such pictures into evidence, including two of Madden with his daughter around Christmas. These pictures did not create unfair prejudice. (See, e.g., *Garcia*, 52 Cal.4th at pp. 720–721, 752–754 [finding no error where the jury was shown an 11-minute 45-second videotape consisting of a photo montage of the victim depicting images of him "as a boy sleeping with a puppy" and as an adult "getting married, raising children, relaxing at home, and enjoying the outdoors"]; *People v. Brady* (2010) 50 Cal.4th 547, 579 (*Brady*) [finding no abuse of discretion in the trial judge's decision to admit a videotape depicting the murder victim celebrating Christmas with his family].)

Perhaps recognizing the limitations of his argument concerning victim impact evidence under our case law, Spencer seeks to have us abandon it. He urges us to reconsider our prior rulings and adopt a narrower limit for victim impact evidence, in line with what he argues is the approach taken by other states. We have been extended such invitations before — and refused them. (E.g., *Pollock*, 32 Cal.4th at pp. 1182–1183.) We continue to do so now.

Under well-established California law, we find that the trial court did not abuse its discretion in admitting the victim impact evidence given in this case.

**F. Admission of Potentially Inflammatory Evidence**

*1. Background*

Although we find the victim impact evidence properly admitted, we nonetheless consider Spencer's argument that "[t]he prosecution used physical evidence and expert testimony to compound the prejudicial effects of its victim

43

impact presentation." The physical evidence to which Spencer refers is two exhibits. One is a photograph of Madden's thigh, showing four abrasions consistent with burns from a stun gun; the other is the shirt that Madden wore on the night of his death, displayed on a mannequin. The jury thus saw a bloodied shirt with multiple markers attached to it to show deformities left by the stabbing. The jury also heard testimony from the medical examiner, Doctor Pakdaman, who referred to the shirt and photograph during his examination. Spencer asserts that the doctor's testimony was "entirely cumulative and unnecessary." To the extent that the testimony introduced something new by focusing on how much Madden was likely to have suffered, says Spencer, it was unreliable and inflammatory.

### 2. Analysis

Spencer's various arguments may be distilled to the contention that the trial court abused its discretion in admitting the physical evidence and expert testimony because their "probative value [was] substantially outweighed by the . . . danger of undue prejudice." (Evid. Code, § 352.) He fails to appreciate, however, how circumscribed is the court's discretion to exclude evidence at the penalty phase. (*People v. Box* (2000) 23 Cal.4th 1153, 1201 (*Box*).) The contrast between the guilt and penalty phases of a capital trial is starkly evident in how certain testimony permissible at the penalty stage would be inappropriate during the guilt phase. (*People v. Haskett* (1982) 30 Cal.3d 841, 863 (*Haskett*) [stating that "appeals to the sympathy or passions of the jury are inappropriate at the guilt phase" but not so at the penalty stage].) Because "at the penalty phase the jury decides a question the resolution of which turns . . . on the jury's moral assessment," "[i]t is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience." (*Ibid.*) At the penalty phase, therefore, the prosecution is entitled to

44

introduce evidence "to place the capital offense and the offender in a morally bad light." (*Box*, *supra*, 23 Cal.4th at p. 1201.)

The bloodstained shirt is admissible to show the brutality of the crime Spencer committed. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1138 (*Zambrano*) ["The prosecution need not sap the force of its case by presenting only the most antiseptic evidence . . . ."].) Moreover, although the prosecution witnesses admitted that more blood got on the shirt as Madden's body was being transported to the coroner's office, the fact that the shirt did not look as it did when Spencer left Madden merely goes to the probative value of the evidence. What's more, the shirt only became more bloody because law enforcement was trying to maintain the position of the body, found facedown, in transporting it to the coroner's office, and blood seeped out from the already inflicted wounds in the process. So the probative value of the shirt was not much affected by the additional blood as the blood "all came from the wounds that were inflicted on Mr. Madden's body." And neither was the danger of undue prejudice, since Spencer's trial counsel alerted the jury to the fact that the shirt had less blood on it when Madden's body was found.

As to the balance between the two, we believe the trial court acted within its discretion in finding that the probative value of the shirt was not substantially outweighed by the risk of undue prejudice. Consistent with our holding in *People v. Medina* (1990) 51 Cal.3d 870, 898–899 — a case where the prosecution entered into evidence a mannequin wearing a victim's bloodstained shirt — we find that "[t]he trial court was in a far better position than we to assess the potential prejudice arising from the display of such physical evidence." Upon the record before us, we see no basis to upset its decision.

Spencer relies on two out-of-state cases in arguing to the contrary: *People v. Blue* (Ill. 2000) 724 N.E.2d 920 and *U.S. v. Sampson* (D.Mass. 2004) 335

45

F.Supp.2d 166 (*Sampson*). Both cases are distinguishable. In *Blue*, *supra*, 724 N.E.2d at p. 934, the court found that the victim's police uniform, splattered with his blood and brain matter, was "probative of a material fact" but nonetheless should have been excluded because its "potential prejudice . . . outweighed its probative value." Yet the standard applied in *Blue* does not appear to be the same as the standard governing the admissibility of evidence in this state. Our Evidence Code makes clear that a trial court has the discretion to exclude evidence if its probative value is *substantially* outweighed by the danger of prejudice. (Evid. Code, § 352.) That the potential prejudice of a piece of evidence simply outweighed its probative value is thus not enough for the trial court to refuse to admit the evidence. Moreover, the court in *Blue* identified a "a coalescence of facts that tip the evidentiary scale" in finding that the blood- and brain-stained shirt should have been excluded. (*Blue*, *supra*, 724 N.E.2d at p. 934.) That "coalescence" contained a number of facts not found in this case, such as: the challenged evidence was "not just bloody clothes, but the clothes of a police officer, which . . . are uniquely 'charged with emotion' "; "the jury knew that the stains on the uniform were not only from the officer's blood — a concept disturbing in and of itself — but also from the officer's brains"; and "the trial court appeared to encourage the jury to engage in a tactile interaction with the uniform." (*Ibid*.) In short, defendant's emphasis on *Blue* — a case concerning facts with "uniquely 'charged with emotion' " — does not persuade us. (*Ibid*.)

The same applies to *Sampson*. There, the District Court for the District of Massachusetts decided to exclude bloody shirts worn by the victims because of "unique considerations." (*Sampson*, *supra*, 335 F.Supp.2d at pp. 184–185.) The court in *Sampson* also applied a "more restrictive" standard for admissibility than is demanded by our Evidence Code. (*Id.* at p. 177.) Furthermore, simply because a trial court exercised its discretion to exclude the shirts does not mean that it

46

would be an abuse of discretion to do otherwise. (*People v. Medina*, *supra*, 51 Cal.3d at p. 899 ["Although the court reasonably could have excluded the mannequins from the jury room, we find no abuse of discretion in the court's contrary ruling."].)

Spencer fares no better with his argument regarding photographs of the abrasions on Madden's thigh. The prosecution introduced this picture to highlight the extent of Madden's suffering. As he was being stabbed by Spencer, Madden was simultaneously shocked by Silveria and his body bore the wounds of both. The photograph is admissible for the same reasons as the shirt — a conclusion that holds despite the fact that Silveria, and not Spencer, inflicted the stun gun injuries. As relevant evidence both of the nature of the crime and Spencer's indifference to the victim's suffering, the photograph was properly admitted. Its probative value was not substantially outweighed by the danger of undue prejudice — the former being relatively high since Spencer admitted to stabbing Madden at the same time that Silveria shocked him, and the latter being relatively low as the jury knew that it was Silveria who shocked Madden.

Finally, we find that the trial court did not abuse its discretion by allowing the medical examiner to testify. Doctor Pakdaman's testimony during the penalty phase did not simply duplicate the statements he gave during the guilt portion. While there was some overlap, his testimony at the penalty phase focused more on how much Madden was likely to have suffered during his final moments (and less on the cause of death, as explained in technical detail during the guilt phase). For instance, Doctor Pakdaman testified that Madden's hand was clenched when rigor mortis set in, a fact consistent with his having struggled mightily but fruitlessly against his bonds before he died. The doctor also testified that Madden did not die immediately from his injuries, as indicated by the foam found in his airways and the abrasion on his head. While Spencer got Doctor Pakdaman to say that the

47

clenched hand was also consistent with something other than the victim having struggled and the estimated time of death was a guess, the doctor's testimony was nonetheless based on evidence and reasonable inferences drawn therefrom. Simply because other inferences were possible does not make the testimony unreliable. Likewise, just because the testimony placed the killing in a "morally bad light" does not render it inflammatory, and therefore inadmissible. (*Box*, *supra*, 23 Cal.4th at p. 1201.)

Spencer resists this conclusion. He purports to find support for his position in *People v. Love* (1960) 53 Cal.2d 843. While *Love* is a case where this court reversed the death judgment due to erroneous admission of evidence "designed to appeal to the passion of the jury" (*id.* at pp. 854–858), it is also a case whose continuing validity has been called into question. In *Brady*, *supra*, 50 Cal.4th at p. 575, we noted that "*Love* predates the high court's ruling in *Payne v. Tennessee*, *supra*, 501 U.S. 808, and the enactment of section 190.3, both of which expressly allow the jury to consider the circumstances of the crime — including its immediate injurious impact." Moreover, in the years since *Love* was decided, "we have upheld the admission of [evidence] similar to [that] at issue" in the case. (*Id.* at p. 575, fn. 13.) "Even assuming for argument that *Love* has not been overtaken by subsequent judicial decisions concerning the admissibility of victim impact evidence in capital trials, it has no bearing on the meaning of section 190.3, factor (a) as presently written." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1368 (*Seumanu*).)

We conclude that the introduction of the challenged physical evidence, expert testimony, and victim impact statements — considered individually and cumulatively — was not error.

## G. Alleged Prosecutorial Misconduct

According to Spencer, the prosecutor made numerous comments amounting to misconduct during his penalty phase closing argument. To preserve such a claim, however, Spencer must have made " 'a timely objection at trial and request[ed] an admonition.' " (*People v. Clark* (2016) 63 Cal.4th 522, 577 (*Clark*).) Otherwise, his claim is reviewable " 'only if an admonition would not have cured the harm caused by the misconduct.' " (*Ibid.*) Spencer's claims thus fail at the threshold since he did not object to the supposed improper comments at trial and has advanced no persuasive reason why an objection or request for an admonition would have been futile.

While Spencer generically asserts that the harm was done the moment the prosecutor "uttered his comments," he supplies no plausible reason for why that is the case. Spencer complains of multiple instances of misconduct, each supposedly driven home by the prosecutor uttering multiple remarks on the theme, and yet objected to none of them. Had he objected at the first instance of any improper comment, the trial court could have instructed the prosecutor to abandon that line of argument and issued specific disapproving directives to the jury. He did not, and so cannot now be heard to complain. (E.g., *Seumanu*, *supra*, 61 Cal.4th at pp. 1340–1341 [listing numerous cases to show how well established is "the rule requiring claims of prosecutorial misconduct be preserved for appellate review by a timely and specific objection and request for admonition"].) (Contra *People v. Hill* (1998) 17 Cal.4th 800, 821 (*Hill*) [excusing the defendant from the obligation to "continually object" in the "unusual circumstances" when he was subjected to a "constant barrage" of the prosecutor's unethical conduct and the trial court not only failed to rein in the excesses but sometimes contributed to it].)

Were we to reach the merits of Spencer's claims, we would find them deficient. To prevail, Spencer must show " 'a reasonable likelihood the jury

49

understood or applied the complained-of comments in an improper or erroneous manner.' " (*Dykes*, *supra*, 46 Cal.4th at pp. 771–772.) This is not a low standard to meet, since " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Id.* at p. 772; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 647.) Spencer consistently ignores this point of law and asks us to adopt the most damaging — and far-reaching — interpretation of the prosecutor's comments to find that he committed misconduct in the five areas discussed below.

*1. Mischaracterization of Jurors' Oath*

Spencer first claims that the prosecution "mischaracterized the jurors' oath and argued that society demanded a death verdict." To support his claim, Spencer points to places in the closing argument where the prosecutor described the jury's verdict as reflecting some external norms, e.g. the "conscience of the community" or society's need for justice. He also highlights parts of the prosecutor's argument in which the prosecutor purportedly said that to vote for life without the possibility of parole was to "take the easy way out." Spencer argues that these comments "diminish[ed] the jurors' sense of personal, moral responsibility for the penalty decision." We disagree.

Far from diminishing the jury's sober responsibility at the penalty stage, the prosecutor stated the correct standard jurors were to follow in deciding whether Spencer should live or die. The prosecutor thus told the jury: "Your responsibility as jurors is to weigh and consider all of the aggravating evidence, all of the mitigating evidence, and make your determination based on a moral evaluation." Moreover, "[t]o return a judgment of death, you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating evidence that it warrants death rather than life without parole."

50

Elsewhere the prosecution impressed upon the jury the weight and solemnity of its decision, and the fact that each juror must participate in the moral weighing on which Spencer's life hung. A fair reading of the prosecution's closing statement persuades us that it did not misstate the law applicable at the penalty stage.

Spencer's argument to the contrary depends on singling out individual comments, assigning the most damaging possible interpretation to them, and then claiming — in contradiction of the record and case law — that these comments amount to prosecutorial misconduct. For example, Spencer uses the prosecutor's comment that the jury's verdict reflected the "conscience of this community" to argue that it "told jurors that they were morally bound to return a death sentence." Yet Spencer's trial counsel also told the jury that it was acting as "the conscience of the community." As the attorneys' comments indicate and our precedent makes clear, "[j]urors *are* the conscience of the community" and it is "not error to tell them so in closing argument." (*People v. Gamache* (2010) 48 Cal.4th 347, 389 [listing cases].) More generally, not every reference to the victim's family — an external institution — the "community," or society at large constitutes an improper attempt to dissuade the jurors from making a personal decision. (E.g., *Zambrano*, *supra*, 41 Cal.4th at pp. 1177–1179.)

Nor did the prosecution denigrate the jury's "solemn responsibility" by insisting that anything but a death sentence would be taking the easy way out. Instead, the prosecutor urged jurors not to forgo the punishment for the wrong reasons — because it would absolve them of the need to weigh the moral blameworthiness of Spencer's conduct. Such comments fall within the scope of acceptable arguments advanced at the close of trial. (See, e.g., *People v. Jones* (1997) 15 Cal.4th 119, 185 ["It was proper for the prosecutor to argue that determining the appropriate punishment in a capital case is a difficult decision that requires courage."].)

51

In sum, we reject Spencer's claim that the jurors were "browbeaten with the message that they owed it to the victim's family, to the prosecutor, to the legal system, and to society to condemn Chris Spencer to death."

2. *Appeal to Emotion*

Spencer next argues that the prosecution improperly appealed to the jurors' emotion during the opening and closing arguments at the penalty phase. Much of his argument replays the contention that the victim impact evidence given in this case — previewed and recapped by the prosecution in its two statements — was unduly prejudicial. To the extent the opening statement contains any content not challenged elsewhere, we note that the prosecutor correctly stated the law when he emphasized that emotion has a role in the jury's deliberation during the penalty phase. (*Haskett*, *supra*, 30 Cal.3d at p. 863.) Not much else is new, and there is no basis for us to treat the issues differently here than how we resolved them in the discussion of victim impact evidence and the prosecution's closing argument.

Nor do we need to revisit our prior cases permitting the People to argue Spencer did not deserve mercy. Most of the prosecutor's comments focused on the effect of Madden's murder on his family and encouraged the jury to empathize with the victim and his survivors — all of which is permissible during the penalty phase. (See, *post*, section II.G.3 [addressing the prosecutor's appeal for the jury to empathize with the victim and his family].) Where the prosecutor came close to eliciting some sort of retribution — such as when he urged the jury to overcome any reluctance it might have in handing down the death penalty by considering how Spencer showed no such reluctance in "plung[ing]" a knife "again and again" into Madden — still such exhortations are not categorically inappropriate. (E.g. *People v. Kennedy* (2005) 36 Cal.4th 595, 636 ["We reject defendant's additional claim that the prosecution committed misconduct during its closing argument in

52

telling the jury that defendant deserved no less punishment than what he inflicted on the murder victim and that defendant did not show mercy or sympathy to the victim.  The argument is permissible under California law."].)  Where, as here, the comments are brief, isolated, and "do not form the principal basis for advocating the imposition of the death penalty," they do not constitute misconduct.  (E.g., *Ghent*, *supra*, 43 Cal.3d at p. 771.)

    3.  *Appeal to Empathy*

    Along the same line as his argument about the jury being asked to withhold its mercy, Spencer argues that it is "*impermissible* for an attorney to argue to jurors that they should place themselves in the position of the victim in assessing the sanction to be imposed against the defendant."  While Spencer claims that "[i]t has long been held" that such an argument is improper, our precedent is to the contrary.  (E.g., *Dykes*, *supra*, 46 Cal.4th at pp. 793–794 ["it is not improper at th[e] [penalty] phase of the trial for the prosecutor to 'invite the jurors to put themselves in the place of the victims and imagine their suffering' "]; *Wash*, *supra*, 6 Cal.4th at pp. 263–264 [similar]; *People v. Jackson* (2009) 45 Cal.4th 662, 692 ["[t]he prosecutor did not commit misconduct by inviting the jurors to put themselves in the shoes of the victim's family"]; *People v. Stitely* (2005) 35 Cal.4th 514, 568 ["the prosecutor was free to ask penalty jurors to consider . . . the unique pain that either the victims or their families experienced as a result of the charged crimes"].)

    Ignoring this line of authorities, Spencer instead calls our attention to *Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757.  We fail to see how *Loth* is relevant, considering that the case dealt with the proper method for assessing money damages in a personal injury lawsuit.  *People v. Lopez* (2008) 42 Cal.4th 960, is likewise unilluminating, since it was not a capital case involving a separate

punishment proceeding.  Here, Spencer is challenging the prosecutor's closing statement made at the end of the punishment phase, and as we have made clear, "[a]lthough it is inappropriate at the *guilt* phase for a prosecutor to appeal to sympathy by inviting the jury to view the case through the victim's eyes [citation], such appeals are entirely appropriate at the *penalty* phase."  (*Winbush*, *supra*, 2 Cal.5th at pp. 485–486.)

*4.* Griffin *Error*

Spencer also fails to persuade us that the prosecution improperly commented on his silence, in contravention of the teaching of *Griffin v. California* (1965) 380 U.S. 609.  The prosecutor purportedly committed this error when he argued that Spencer's trial counsel "won't be able to point to any remorse on the part of his client for what he has done, because there is none here before you."  Quoting from Spencer's confession, the prosecutor continued, "No remorse, of course, unless it's in his statement where he speaks of himself:  'What am I looking at?  How long am I going to have to serve? . . . Oh fuck.  There went my life.' "  The prosecutor then asked rhetorically, "Anywhere in there does he say that he's sorry for what he's done?"

We do not perceive in such remarks an oblique reference to Spencer's decision to remain silent at trial.  Instead, the prosecution's emphasis is that there is no evidence that Spencer has expressed remorse.  The lack of remorse is relevant, as its presence mitigates against the death penalty.  (*Wash*, *supra*, 6 Cal.4th at p. 265 ["It is proper to argue that remorse is lacking as a circumstance in mitigation."]; *Dykes*, *supra*, 46 Cal.4th at pp. 798–799 [similar].)  Moreover, calling attention to the fact that "there was no evidence that [the] defendant had ever expressed remorse" does not violate *Griffin*.  (*Zambrano*, *supra*, 41 Cal.4th at p. 1174 ["The prosecutor did not comment that defendant had failed to take the

54

stand to express remorse; he simply said there was no evidence that defendant had ever expressed remorse. We have consistently found such penalty phase argument permissible under *Griffin* . . . ." (italics omitted)]; *Brady*, *supra*, 50 Cal.4th at p. 585 [similar].) In this case, the prosecutor simply stressed that, during his confession, Spencer showed no sympathy to the victim and only expressed concerns about what would happen to himself. We find no constitutional violation in such remarks.

### 5. *Bengal Tiger Story*

Finally, Spencer claims that the prosecution dehumanized him by telling a story in which he is analogized to a vicious animal. The story goes something like this: two friends visit a zoo and see a Bengal tiger "lying in the sun," "kind of fat and relaxed and comfortable." One friend said to the other: "That's not a Bengal tiger." The two then fly to India, where, in the midst of the jungle, they encounter a creature "fifteen feet long," standing "over its kill," with "blood dripping from its mouth." After the two friends made a narrow escape, they agreed that they now have seen a Bengal tiger. The prosecutor explained the parable this way: "The point of [the story] is this . . . . You've got Mr. Spencer in court. You've got a photo of him here. . . . [But] [t]he only one that saw the Bengal tiger, the real Bengal tiger, inside that man, Chris Spencer, was Jim Madden. In that setting that night the tiger came out and that's the result. The boy shown in the photograph is not the tiger. The boy didn't kill him. The defendant did, the man seated in court."

Considered in context, the message conveyed by this aspect of the prosecutor's closing argument was not categorically different from passages we have deemed acceptable in earlier capital cases. We have determined it was acceptable, as an example, for the People to convey in closing that jurors should

55

not be "misled by defendant's benign and docile appearance at trial, but to remember him as the murderer." (*People v. Duncan* (1991) 53 Cal.3d 955, 976–977.) Indeed, the Bengal tiger story has been told in California courtrooms before, and we have more than once found no impropriety in its use. (*Ibid*.; *Brady*, *supra*, 50 Cal.4th at p. 585.) The People may comment on the evidence introduced to convey the viciousness of Madden's murder, including by using a story that could be understood by some jurors to describe the murderer as a monster. (*Zambrano*, *supra*, 41 Cal.4th at p. 1172 ["Argument may include opprobrious epithets warranted by the evidence."]; *Farnam*, *supra*, 28 Cal.4th at p. 168 [concluding that the prosecutor's descriptions of the defendant as " 'monstrous, ' " " 'cold-blooded, ' " and a " 'predator' " were fair comment on the evidence].)

So at the close of the penalty phase, the prosecutor has wide latitude and may argue his case with rigor. (*Dykes*, *supra*, 46 Cal.4th at p. 768; *Seumanu*, *supra*, 61 Cal.4th at p. 1331.) We conclude that the prosecutor here did not exceed the relatively wide scope the law affords him.

## H. Consideration of Graber Robbery During Penalty Phase

Spencer contends that the trial court erred in its response to a question from the jury regarding how an aspect of the jury instructions related to the jury's consideration of the robbery of Ben Graber at the Gavilan Bottle Shop. We find otherwise.

### 1. Background

At the end of the penalty phase, the court instructed the jury on the mitigating and aggravating elements that it may consider in deliberation. Specifically, the court instructed the jury on the various factors laid out in section 190.3, including factors (a), (b), (j), and (k), the catchall factor. As laid out in the court's instructions, these are:

56

"(a) The circumstances of the crime which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.

"(b) The presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involved the use or attempted use of force . . . .

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."

The court also instructed the jury that the robbery of Graber at the Gavilan Bottle Shop is an aggravating circumstance that it may consider under factor (b). The instruction was given over Spencer's objection. Spencer argued that the robbery of Graber does not fall under factor (b) because that robbery and Madden's murder were "indistinguishable." As Spencer's counsel stated, "what we got here is a course of conduct over the space of about a week . . . based more or less on the same motivation and culminating in the robbery and murder at Leewards." The prosecution disagreed, pointing out that although the robbery and murder were "consolidated for purposes of this trial," they were "two separate crimes," committed four days apart. The court sided with the prosecution.

The jury then entered deliberation. Two days later, it sent a question to the trial judge, asking "Does Factor (j) apply to Factor (b), the robbery of Ben Graber, in regards to a mitigating factor, or does Factor (j) relate only to the robbery, burglary and murder of James Madden?" The court consulted with counsel for both sides, indicating that in its opinion, "Factor (j) only relates to the robbery, burglary and murder of James Madden." Spencer objected, with the substance of

57

his lengthy objection being that, under factor (j), the jury can consider his limited role in the robbery of Graber as a mitigating circumstance to the murder of Madden. He acknowledged, however, that he understood why "the defense, don't have it coming to get strong endorsements from the bench." After some delay, the court instructed the jury that "[t]he Factor (j) only relates to the robbery, burglary and murder of James Madden." Three days later, the jury returned a verdict of death.

On appeal, Spencer argues that the court's response to the jury's question constituted reversible error. He makes three independent arguments to support his claim. First, he asserts that the robbery of Graber was factor (a) and not factor (b) evidence. Second, he claims that, even if the robbery was factor (b) evidence, the burglary may be considered as a mitigating circumstance under factor (j). Finally, he says that even if the court's answer was technically correct, it was misleading, as the court should have instructed the jury that it could consider Spencer's limited participation in robbery of Graber as a mitigating circumstance under factor (k), the catchall factor.

2. *Analysis*

Spencer's claim on this issue is, at its core, a contention that the court "misled the jury into believing that Appellant Spencer's relative culpability in the Gavilan Bottle Shop robbery was irrelevant." We reject this contention.

On appeal, whether the trial court erred in instructing the jury is determined by examining " ' "the entire record, including the instructions and arguments" ' " to see if " ' "the jury was misled to the prejudice of the defendant." ' " (*Dykes*, *supra*, 46 Cal.4th at p. 795.) The record persuades us that the trial court did not mislead jurors into believing that the nature of Spencer's participation in the incident at the Gavilan Bottle Shop, in which he acted as the getaway driver and

got $70 for his participation, was irrelevant. As part of its instructions before the jury retired to deliberate, the court told jurors that they may consider "[a]ny other circumstance which extenuates the gravity of the crime . . . and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death." Spencer thus already got what he contends was his due: an instruction that the jury should consider "any other circumstance" — which includes Spencer's limited participation in the robbery of Graber — as a mitigating circumstance under factor (k), the catchall factor.

Nothing the court conveyed in answering the jury's question affected this instruction. The jury asked the court about factor (j) — not factor (k) — and the court gave a responsive answer as to factor (j). Contrary to what Spencer asserts, the court was not required to reinstruct the jury as to other evidentiary limits, including the wide-ranging scope of factor (k). (*People v. Burton* (1989) 48 Cal.3d 843, 866–867 ["The trial court responded to the jury's question; it was not required to do more."].) The court's answer itself could not have misled the jury because the content of the response — strictly relating to factor (j) — posed no bar to the jury's ability to take into account mitigating circumstances under factor (k). (See *Burton*, *supra*, 48 Cal.3d at p. 867 [concluding that "the jury could not have been misled concerning the relevant scope of mitigating evidence" when the trial court properly instructed it with regard to factor (k) prior to answering a question that arose during deliberation].)

In addition, Spencer is mistaken that the court's characterization of the Graber robbery as factor (b) evidence precluded the jury from considering his "relative culpability" in that crime. Although the presence of criminal activity other than the capital crime is an aggravating factor, how *much* the Graber robbery aggravated the circumstances of Madden's murder is an evaluation the jury was free to make. The court specifically instructed the jury as such, stating that

59

"[e]ach individual juror may weigh and consider each and all of the various factors and circumstances on which relevant evidence has been offered in this case, being free to assign whatever value he or she deems appropriate to each factor and circumstance." The jury thus could have considered the fact that Spencer "only" acted as a getaway driver in deciding the weight to attach to this crime. Again, Spencer got what he wanted from the court's instruction: the jury indeed was able to consider his "level of participation in the prior crime when assessing how much weight to assign to the 190.3(b) evidence."

The court's answer to the jury's question did not do violence to this instruction. The answer only informed jurors that they could not consider Spencer's participation in the robbery when debating whether Spencer's involvement in *the murder* was minor under factor (j). Pursuant to factor (j), the jury considers "[w]hether or not the defendant['s] . . . participation in the commission of the offense was relatively minor." (§ 190.3, subd. (j).) We agree with the People that the singular reference to "the offense" in a statutory provision governing the life or death decision in a capital crime refers only to the capital crime. (See *People v. Keenan* (1988) 46 Cal.3d 478, 513, fn. 15 [characterizing factor (j) as "minor participation in the capital offense"].) It does not refer to any other offense, including a robbery committed four days earlier, targeted at a different victim at a different location.

Finally, the court correctly instructed the jury that the Graber robbery was factor (b) evidence. We said as much in *People v. Prince* (2007) 40 Cal.4th 1179. There, in the same proceeding where he was tried for murder, the defendant was tried for multiple burglaries of homes belonging to persons other than the murder victims. (*Id.* at p. 1188.) Citing the same authority as Spencer here principally relies on, the defendant in *Prince* argued that "noncapital crimes of which a defendant was convicted in the same proceeding [as the capital crimes] never may

60

be considered at the penalty phase as evidence in aggravation under section 190.3, factor (b)." (*Id.* at p. 1292.) We rejected the claim, finding that the robberies of those who were not murder victims were admissible under factor (b) and did not become otherwise merely "because of a joinder with capital offenses." (*Ibid.*) Moreover, although the burglaries of the homes of the murder victims and those who escaped unharmed featured the same modus operandi (*id.* at pp. 1192–1193), we had no trouble concluding that burglaries of homes not belonging to the murder victims were factor (b) evidence in the penalty phase of the murders. We come to the same conclusion here.

## I. Completeness of Appellate Record

### 1. Background

In addition to his claims about errors committed by the trial court, Spencer asserts that this court also erred by refusing to supplement his appellate record with his codefendants' trial transcripts. The argument hinges on comments that the prosecution made in its closing statement in the penalty phase.[6] The prosecutor there highlighted the fact that Spencer — by his own confession — was the first to stab Madden. In response to the various testimonies elicited by the defense that Spencer was a follower, not the leader, and the emphasis on the same theme during closing argument, the prosecutor stated, "remember, when he says follows the lead there was no stabbing before Mr. Spencer started it. Under Mr. Spencer's version, in effect, John Travis and Danny Silveria followed his lead. He led the stabbing."

---

[6] Spencer also mentions that certain materials from his codefendants' trial, e.g., prospective juror questionnaires, were reused at his trial. Such materials, however, contribute nothing to Spencer's claim (discussed below) that the prosecution employed inconsistent theories in his trial and his codefendants' trials.

Spencer's trial counsel, James Mantell, objected. What he conveyed is that he thought it was "not permissible" that the prosecution should try to reduce Silveria and Travis "to the position of stooges for Chris Spencer." In a sidebar, Mantell argued that during Silveria and Travis's trial, "they were the principals and Mr. Spencer was absent." "But more importantly," said Mantell, "there is on the record of this case evidence . . . which establishes very clearly the tertiary position of Chris Spencer in the planning and plotting of this entire operation." The prosecutor riposted that he was referring to evidence on the record of this case. The court dealt with the objection by directing counsel for both sides to "stick . . . to what was brought out during the course of this trial." Following this instruction, the prosecutor argued to the jury: "Don't speculate. Don't guess. . . . Look to the evidence. And I submit that you're not going to find the evidence that Mr. Mantell is talking about when he says that Chris Spencer was just following the lead. Chris Spencer acted. He made choices and he is fully accountable therefor. He admits finally being the initial stabber and then passing the five [sic] on to others so that they could continue with the stabbing that he began." Relying on these comments, Spencer now claims that the prosecution used inconsistent theories at his trial and his codefendants' trials and so arguably violated his due process rights.

The nub of Spencer's contention, however, is not about what happened at trial, but rather what transpired afterwards. After current counsel was appointed to represent Spencer on appeal, he petitioned this court for an order augmenting the appellate record to include the transcripts of Silveria and Travis's trial. We denied the motion. Spencer argues that this was a prejudicial error requiring reversal, with prejudice stemming from the fact that the fees to which his counsel is entitled depend on the length of the record. Had we supplemented the record, counsel could have obtained "up to an additional $30,000." Without this money, counsel

was "handicap[ped]" since "[w]hatever the quantum of work Spencer's counsel could perform, properly contemplated [sic] counsel could do more." "This deficit" of money, says counsel, "potentially affects each and every aspect of Spencer's case in the post conviction arena." Spencer also contends that his inconsistent theories claim must be raised on appeal, because had he "chosen to pursue it via habeas corpus . . . the result would have been waiver of the issue" under *In re Dixon* (1953) 41 Cal.2d 756 (*Dixon*). We find no merit in his arguments.

### 2. *Analysis*

Under Spencer's theory, whenever an appellate record omits any information that a defendant claims should have been included, prejudice necessarily ensues because counsel is handicapped by the lack of fees that "should have been forthcoming." Prejudice, as Spencer tells it, occurs "regardless of the length of the missing record because *any* additional uncompensated work creates a handicap relative to other counsel to that extent."

Spencer's argument proves too much. Even taking the argument at face value, we are unclear what "additional uncompensated work" counsel claims to have done, since he does not assert that he reviewed the transcripts of Spencer's codefendants' trial despite their not being included in the appellate record. We also note that it is very much uncertain whether counsel would have received *any* additional fees even if the record were supplemented in the manner he requested. As Spencer concedes, his counsel was already being compensated at the highest level under the fixed fee system. Additional fees thus would have been available only "[i]n extraordinary and unique situations." (Supreme Ct. of Cal., Guidelines for Fixed Fee Appointments, on Optional Basis, to Automatic Appeals and Related Habeas Corpus Proceeding in the Cal. Supreme Ct., guideline 3 ["In

extraordinary and unique situations, the Court will entertain requests for additional fees based on exceptional circumstances (e.g., circumstances that were unforeseeable at the time of the appointment of counsel on a fixed fee basis). In such situations, counsel shall have the burden of proof to justify any additional fees."].) We see no hints from counsel's briefing that Spencer's case presented such "extraordinary," "unique," or "exceptional circumstances." (*Ibid.*)

In any event, we are not persuaded the appellate record here is inadequate. A criminal defendant "bears the burden of demonstrating that the record is not adequate to permit meaningful appellate review." (*People v. Young* (2005) 34 Cal.4th 1149, 1170.) In this case, Spencer claims that the prosecutor argued inconsistent and irreconcilable theories at his and his codefendants' trials — an issue he would have brought up on appeal had the record been augmented to include materials from his codefendants' trial. But our precedent makes clear that such an inconsistent theories claim should be brought — not on appeal — but in a habeas corpus petition. (*People v. Sakarias* (2000) 22 Cal.4th 596, 635 (*Sakarias*) ["Where, as here, the asserted inconsistencies in prosecutorial theory were not the subject of any proceeding in the trial court and, hence, neither the inconsistencies nor any explanations the prosecutor may have been able to offer appear in the appellate record, any due process claim defendant can state should be 'presented by petition for writ of habeas corpus rather than by appeal.' "]; *People v. Waidla* (2000) 22 Cal.4th 690, 743–744 [same]; *People v. Moore* (2011) 51 Cal.4th 1104, 1143 [same].)

Spencer attempts to undermine this conclusion by arguing that his trial counsel objected during the prosecution's closing statement, and so did make the "asserted inconsistencies in prosecutorial theory" the subject of proceeding at trial. (*Sakarias*, *supra*, 22 Cal.4th at p. 635.) The objection, however, centered on what the evidence introduced in Spencer's trial showed. While Spencer's trial counsel

64

alluded to what the prosecutor argued in Silveria and Travis's trial, counsel agreed that what mattered was the evidence "on the record of *this* case" and did not otherwise seek to introduce the record of that separate trial into Spencer's trial proceeding. As the inconsistent theories claim was not litigated below, it cannot be litigated on this direct appeal.

Finally, since the claim properly belongs in a habeas petition, it is not barred by *Dixon*'s "general rule" that a claim which "could have been" raised on appeal cannot wait for habeas proceeding. (*Dixon*, *supra*, 41 Cal.2d at p. 759.) Spencer may make his inconsistent theory claim on habeas corpus without fear of a *Dixon* bar and suffers no prejudice because of his appellate record.

## J. Constitutionality of California's Death Penalty Statute

Spencer asserts that several aspects of California's death penalty statute violate the United States Constitution. As Spencer concedes, we have previously considered and rejected each of his claims. We decline his request to here reconsider our prior conclusions and continue to hold that section 190.2, which enumerates a number of special circumstances making a defendant eligible for the death penalty, is not impermissibly broad. (*People v. Wall* (2017) 3 Cal.5th 1048, 1072.) Likewise, section 190.3, factor (a), in allowing the sentencer to consider the " 'circumstances of the crime' " in a determination of whether to impose the death penalty, is not unconstitutionally vague, arbitrary or capricious. (*Clark*, *supra*, 63 Cal.4th at p. 643.) Nor do the California or federal Constitutions require the prosecution to bear the burden of proof or persuasion at the penalty phase of a capital trial, or compel the jury to find beyond a reasonable doubt matters such as the veracity of aggravating factors. (*Seumanu*, *supra*, 61 Cal.4th at p. 1376.)

Because capital defendants and noncapital defendants are not similarly situated, California does not deny capital defendants equal protection by providing

certain procedural protections to noncapital defendants but not to capital defendants.  (*People v. Johnson* (2016) 62 Cal.4th 600, 657 (*Johnson*).)  In particular, written findings by a jury recommending a death sentence are not required.  (*People v. Salazar* (2016) 63 Cal.4th 214, 256.)

The absence of a requirement for the court to consider intercase proportionality does not violate the federal Constitution.  (*Clark*, *supra*, 63 Cal.4th at p. 644.)  Nor does the jury's reliance on unadjudicated criminal activity as a factor in aggravation under section 190.3, factor (b), without unanimously agreeing on its existence beyond a reasonable doubt, deprive a defendant of any rights guaranteed by the federal Constitution, including the Sixth Amendment right to jury trial.  (*Clark*, *supra*, 63 Cal.4th at p. 644.)

The use of restrictive adjectives, such as "extreme" and "substantial" in section 190.3's list of potential mitigating factors, does not bar consideration of constitutionally relevant evidence.  (*Simon*, *supra*, 1 Cal.5th at p. 150.)  There is no constitutional requirement that the jury be instructed concerning which of the sentencing factors are aggravating, which are mitigating, and which could be either aggravating or mitigating.  (*Clark*, *supra*, 63 Cal.4th at p. 644.)  International law does not render the death penalty unconstitutional as applied in this state.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1092.)  And Spencer advances no other persuasive basis for us to find California's capital sentencing scheme unconstitutional as a whole.  (*Johnson*, *supra*, 62 Cal.4th at pp. 657–658.)

## III. DISPOSITION

Because we find no reversible error, we affirm the judgment in its entirety.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**HILL, J.**\*

---

**\***      Administrative Presiding Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Spencer
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S057242
**Date Filed:** July 12, 2018
_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Hugh F. Mullin III

_____

**Counsel:**

Emry J. Allen, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Alice B. Lustre and Arthur P. Beever, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Emry J. Allen
5050 Laguna Boulevard, Suite 112
Elk Grove, CA  95758
(916) 691-4118

Arthur P. Beever
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 510-3761