Filed 5/20/25  P. v. Thomas CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082842 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD291326) |
| ADAM THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Carlos O. Armour, Judge.  Affirmed.

Mark A. Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Adam Thomas of the first-degree murder (Pen. Code, § 187, subd. (a))[1] of his brother, Trenton Thomas. The jury also found true the allegation that Adam had personally used a dangerous and deadly weapon—a crossbow—in the commission of the murder (§ 12022, subd. (b)(1)). The trial court sentenced Adam to 25 years to life in state prison.

Adam contends on appeal that the trial court prejudicially erred when it permitted the prosecution to impeach his trial testimony with inconsistent statements he made about his brother's death in an interview with law enforcement officers after his arrest. Before making these statements during the interrogation, Adam repeatedly requested assistance of counsel when advised of his rights, but then he ultimately agreed to speak to the detectives without an attorney. He argues that the statements were the product of coercion by the detectives and therefore should have been excluded at trial. After reviewing the video recorded interviews, we conclude that Adam's statements were voluntary and thus admissible at trial for purposes of impeachment. We therefore affirm the judgment.[2]

---

[1] Undesignated statutory references are to the Penal Code.

[2] In Adam's opening brief on appeal, he also argued the trial court erred by modifying the then-current version of CALCRIM No. 510, which explains the law relating to excusable homicide. On reply, however, Adam notes that the Judicial Council Advisory Committee on Criminal Jury Instructions revised CALCRIM No. 510 in September 2024 such that the instruction is now substantially similar to the instruction used at his trial. Accordingly, he no longer contends the trial court erred by modifying the 2022 version of the instruction.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution's Case*

Adam grew up in Sacramento with his parents, Andrew and Tina, his older sister, Chay, and his two older brothers, Beau and Trenton. Trenton started using drugs when he was in high school and soon developed a substance abuse issue. His substance abuse placed a lot of stress on his family.

In the summer of 2021, Tina and Chay drove Trenton down to a sober living facility in San Diego. In July 2021, Adam purchased a crossbow, arrows, and hunting broadheads from Amazon. In August 2021, Adam told his parents he was going to San Diego to visit colleges and visit Trenton. Adam asked his mother to go with him, but she did not want to go.

Adam texted with Trenton before he arrived in San Diego on August 9, 2021. In text messages on August 8 and 9, Trenton initially told Adam not to come visit him, but the two eventually agreed to meet for dinner the night of August 9.

Later that night, Adam was captured on residential video surveillance with another person in an alley near a skate park in San Diego. In the video, a white vehicle, later confirmed to appear consistent with the color of and markings on Adam's car, is seen entering the alley. The video then shows Adam walking back and forth between the front of his car, where the second person was located, and the trunk of his car. He eventually retrieved an item from the trunk.

After Adam walked back toward the front of his car, a sound consistent with the firing of a crossbow can be heard on the video. The crossbow is not visible. The second person then ran into the park eastbound. Immediately afterwards, Adam can be seen on the video placing an object back into the

trunk of his car, getting into his car, and rapidly accelerating in reverse out of the alley.

On August 10, 2021, a security guard found Trenton's body in the skate park and called police. Trenton appeared to have sustained traumatic injuries, and his face was covered in blood. There was a 188-foot-long trail of blood from the alley where Adam's car had been seen on the surveillance video to the location where Trenton's body was found. The blood trail led to larger pools of blood and a Headhunter-brand crossbow bolt and arrow, which was found along the blood trail leading to the alley. The tip of the bolt was missing. Police also found a blue bandana tied in a knot, as if it had been used as a face covering or blindfold, in the alley.

On August 13, a park ranger recovered a crossbow in a tree at the end of a trail into a canyon. The same park ranger also found a box of arrows and a hat in a bag with the word "Sacramento" on it. The items were discovered less than one mile from where Trenton's body was found.

A medical examiner performed an autopsy of Trenton and found he had an entry wound in front of his right ear and an exit wound through his left ear canal. An arrow appeared to have traveled from right to left in a horizontal pattern and slightly backwards from the front of the body towards the back of the body. The medical examiner opined that the injuries were "possibly" consistent with a bladed arrowhead being pulled back out of Trenton's head. The cause of death was a perforating crossbow arrow wound to the head, which caused Trenton to experience significant blood loss and heart failure. The medical examiner opined that the manner of death was homicide, meaning that another person was involved in the death.

Police officers searched Adam's apartment in Sacramento and recovered a box for a crossbow and two boxes of broadheads—one of which

4

had been opened and was missing four out of the five heads—in his bedroom. They also searched Adam's car and found a Barnett-brand container used to hold crossbow bolts behind the driver's seat and a handwritten note with directions from the crime scene to a location in Escondido. Police later discovered that Adam had paid for a stay at an Airbnb in Escondido between August 9 and August 10, 2021.

An archery shop owner with 20 years of experience testified about crossbows and other types of bows. A crossbow is a very accurate and easy weapon to shoot. Bolts, rather than arrows, are fired from crossbows. Bolts have a bigger diameter and shorter length than arrows, and they come with tips for target practice. Broadheads, on the other hand, are used for hunting. They are essentially razorblades, and they are made for inflicting damage. Crossbows are not allowed on public park ranges in San Diego County because they are too hazardous due to their velocity and penetration.

The crossbow in this case appeared to require 165 pounds of pull. Once the bolt is pulled all the way back, it goes into an automatic safety mode and cannot be fired until the safety switch is moved into the fire position. The safety mechanism is labeled green for safe and red for fire. It does not require much force to move from safe mode to fire mode—the force of only one finger would be sufficient. To fire, a person would have to step through the bottom stirrup, hook the cocking device on each side of the rail, pull back with both arms until they hear it click—meaning it is locked into safety mode—then slowly let off tension from the trigger pull, load a bolt, bring the crossbow to their shoulder, acquire the target, push the safety mechanism into fire mode, and squeeze the trigger.

B.  *The Defense*

Adam's parents, sister, and brother testified in his defense.  His parents stated that he is not a violent person and would not have intentionally killed Trenton.  Adam's father believed that what happened to Trenton must have been an accident.  He testified that Adam was a loving and caring person not capable of murdering Trenton.

Adam also testified in his own defense.  He purchased the crossbow for Trenton as a birthday gift because he thought Trenton would think it was cool and he liked to shoot things.  He also purchased the hunting broadheads because he wanted the arrows to look "really cool."  While Adam was still at home, he opened the crossbow, put the pieces together, and shot it twice in his backyard.

Before Adam left for San Diego to visit his brother, he placed the cocked crossbow in the trunk with the bolts next to it.  After arriving in San Diego, Adam picked up his brother and they went to dinner.  After dinner, they walked down to the beach, where Adam told Trenton he had a present for him that he wanted to show him at a skate park.

After they arrived at the park, Adam asked Trenton to put on a blindfold before receiving his present, and the two continued having a casual conversation.  Trenton smoked a vape pen while Adam went to his trunk to load the crossbow.  He wanted to load it so that it would be ready for Trenton to shoot it.

Adam recalled that Trenton was in a "baseball catcher" position, squatting down, smoking, and looking at his phone when Adam walked back to his trunk to get the crossbow.  Adam put the bolt in the crossbow and accidentally flipped the safety switch off the crossbow.  He explained: "[T]he safety is green and the fire is red, which I completely messed up. . . .  I

6

pictured safe as stop and as -- go as green.  And as I was pulling it out of the trunk, I flipped the -- I flipped the switch to -- to red, but I thought that was flipping it to stop."  As Adam walked around his car, he tripped and fumbled the crossbow, and as he grabbed it, his finger grabbed the trigger barrel rather than the pistol grip, and the crossbow fired.  Trenton fell to the ground, and Adam "just lost it" and "freaked out."  Adam stood over his brother for a second, and then Trenton got back up, which scared Adam.  Adam did not know what was happening and did not know what to do, so he threw the crossbow in his car and left as quickly as possible.  He did not attempt to help his brother.

At some point after Adam started driving away, he hit a dead-end, took the crossbow out and threw it "as hard as he could."  He drove back to the Airbnb in Escondido and then ultimately drove back to his parents' home in Sacramento.  He did not tell his family what had happened because he was too scared and thought they would not understand.  Adam testified that he did not buy the crossbow or plan the trip to San Diego with the intent to murder Trenton, did not have any reason to murder Trenton, and loved Trenton more than anything in the world.  He said Trenton's death was an accident, which he told police multiple times.

On cross-examination, the prosecutor asked Adam about statements he made to detectives after his arrest that were inconsistent with his trial testimony.  The prosecutor played for the jury two video recordings of Adam's interview with detectives.  During the interview, Adam told the detectives he pointed the crossbow as if he was going to fire it before it went off.  He told the detectives that he was going to tap Trenton on the shoulder while Trenton was facing away from Adam, removed his hand because it was in the trigger chamber, and accidentally pulled the trigger with his finger as he did

7

so. Adam did not tell the detectives that he had tripped, and he agreed with the prosecutor that the surveillance video did not show him tripping. Adam also did not tell the detectives that Trenton had been in a crouching position, as he had testified to on direct examination. On cross-examination, he testified that Trenton had been crouching but moved to standing position as Adam approached him. After driving away, Adam took the crossbow, arrows, hat, and bag out of his car and threw them into a canyon. He admitted that he had lied to his mom several times after the incident to "try and cover [him]self up."

C. *The Prosecution's Rebuttal*

On rebuttal, the prosecutor called several witnesses to testify to Adam's reputation in the community. Adam's two roommates, one of whom was his former restaurant coworker, testified that Adam had a reputation for being a violent and angry person. One roommate was scared for her safety living with Adam, and the other personally believed Adam to be violent based on the way Adam disciplined his dog. Adam's restaurant manager also believed Adam had a violent reputation for the last two months of his employment, and he was concerned that Adam would hurt other coworkers.

D. *Jury Verdict and Sentencing*

The jury found Adam guilty of first-degree murder and found the use of a weapon allegation true. The trial court denied Adam's motion to reduce the verdict to second-degree murder. The court struck the weapon enhancement and sentenced Adam to prison for 25 years to life.

DISCUSSION

Adam contends the trial court erred by allowing the prosecutor to impeach his trial testimony using statements he made to detectives during custodial interrogation after he repeatedly requested the assistance of

8

counsel.  Based on our independent review, we conclude that these statements were voluntarily made and therefore admissible for purposes of impeachment.

A. *Additional Factual Background*

San Diego Police Detectives Wade Irwin and Steven Choy interviewed Adam in Sacramento after his arrest on August 14, 2021.  The interview was recorded on video.  After asking Adam basic informational questions, Detective Irwin showed Adam photographs of the crime scene where Trenton was killed and stated that police had recovered a crossbow they believed was used to kill Trenton.  Detective Irwin told Adam: "I've been a police officer 14 years.  Um, what I've learned over my career is that people make mistakes.  And when they make mistakes, the best thing to do is to admit your mistake and ask for forgiveness.  [Because] this is all gonna come out in court.  We have a lot of evidence.  That's why we're here talking to you.  And your family is gonna have to go to court.  Your parents are gonna have to go to court.  Something happened.  I don't know why.  But I'd like to talk to you and find out what's going on, okay.  So, let me read you your rights."

Detective Irwin then read Adam his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda* rights) and the two had the following exchange: "Irwin: Yes?  Having in mind and understanding your rights as I've told you, are you willing to talk to me?  [¶]  [Adam]: I'd like to have a ret -- a attorney present.  [¶]  Irwin: Okay, that is your right.  Um, just so you know, you're gonna be -- you're gonna be booked in for murder of your brother Trenton.  So, you will be going to jail today.  [¶]  [Adam]: Oh, okay.  [¶] Irwin: Um, and we'll call your parents and let you kn -- let them know all that.  But, uh, I'm gonna leave you my card.  I don't -- I'm sure you have a property -- I'll leave it in your property bag, in case you change your mind

9

and you want to talk to me, we've been in contact with your attorney and all that stuff. [¶] [Adam]: Is talking to you the way that, like, the steps to get out of jail, or is that usually after trial and stuff like that? [¶] Irwin: I can't give you legal advice. But, um, if you want -- at this time, if you want to tell me your side of the story -- [¶] [Adam]: I'll tell you. I'll tell you. [¶] Irwin: W -- well hold on. I need to -- I need to -- I need to be clear here, okay. [¶] [Adam]: Yeah. [¶] Irwin: Okay. So, I'm gonna read you your rights again, and if you want to tell me your side of the story, we can do that. [Adam]: Okay."

Detective Irwin then advised Adam of his *Miranda* rights a second time and asked: "Having in mind and understanding your rights as I've told you, do you want to talk to me? [¶] [Adam]: I'm sorry. I'm very nervous. I think I -- I'd still like the attorney. [¶] Irwin: Okay. Um, like I said, if you want to tell me your side of the story -- because I wasn't there, right. All I'm going off of is evidence that we have. [¶] [Adam]: Yeah. [¶] Irwin: If you want to tell me your side of the story, I need to hear it from you. [¶] [Adam]: Yeah. [¶] Irwin: I can't hear it from anybody else. So, this is your chance to tell me that. [¶] [Adam]: I think I'd like to talk to my attorney first. [¶] Irwin: Okay. Alright, that's fine. If you want to change your mind before we go to jail, you can do that. [¶] [Adam]: Okay. [¶] Irwin: Okay. [¶] [Adam]: Okay. [¶] Irwin: Alright. I'm gonna leave you my card here. It might go in your property bag, but, um -- [¶] [Adam]: So -- so, I'm going to be going to jail and then just waiting for my attorney there, and -- [¶] Irwin: You're gonna be going to the jail, and then you'll go through the legal process of, um, going back to San Diego, extradition, all that stuff. [¶] [Adam]: I -- am I going to jail in San Diego? [¶] Irwin: You're going to jail here today, and eventually, you'll be brought back to San Diego [because] that's where the crime

occurred.  [¶]  [Adam]: Okay.  [¶]  Irwin: Okay?  Like I said, um, I want you to think about this because, uh, your family deserves some closure to figure out -- and the -- and, you know, the -- you might have a good reason why this happened.  But right now there's a lot of unanswered questions, but we have enough evidence to put you in.  Something happened, but I need to know your side of the story.  And I'm sure you're wanting your side of the story out there.  Maybe you had a good reason for all this but -- unless we hear it from you, then we're never gonna know, right.  That's not fair.  You're -- you're 20 years old, right?  [¶]  [Adam]: Yeah.  [¶]  Irwin: You have your whole rest of your life, you know.  Obviously, you made a big mistake, but it's not the end of the world.  But you need the -- like I said, the best thing to do sometimes is when you (unintelligible) you've heard that all your life.  When you're a kid, like, 'Hey, if you make a mistake, just admit it and just ask for forgiveness.' Okay.  So think about that stuff.  Alright?  [¶]  [Adam]: Yeah.  [¶]  Irwin: Alright.  [¶]  [Adam]: Um, I mean, I guess -- I guess you can read me my rights one last time and then I'll tell you.  [¶]  Irwin: Okay.  Okay.  You have the right to remain silent.  If you give up the right to remain silent, anything you say can and will be used in court against you.  You have the right to speak with an attorney of your choice before questioning and to have the attorney present during questioning.  If you cannot afford an attorney, one will be appointed for you by the court prior to any questioning if you so desire.  The attorney will not cost you anything.  The services are free.  Do you understand each of these rights that I explained to you?  [¶]  [Adam]: Yes.  [¶]  Irwin: Having in mind and understanding your rights as I have told you, are you willing to talk to me?  [¶]  [Adam]: Yes."

Adam then told the detectives his version of the events leading up to Trenton's death.

Before trial, Adam moved to suppress his statements to the detectives, arguing that (1) they were obtained in violation of his *Miranda* rights because the detectives failed to honor his repeated requests for counsel, and (2) they were obtained by coercive methods. In response, the prosecutor argued that the *Miranda* issue was moot because she did not intend to introduce Adam's statements in the People's case-in-chief, but she should be permitted to use the statements for impeachment because they were not coerced or involuntary.

After reviewing the video recorded interrogation, the trial court agreed that Adam's statements were voluntary, and the prosecutor could therefore use them for impeachment purposes if Adam testified. The court found that there was no coercive police conduct, and Adam was merely debating in his own mind whether he wanted an attorney after being given his *Miranda* warnings and having them repeated twice more. The detective was honest with Adam when he said they had enough to charge him with murder, and he was going to be charged, taken into custody, and transported to San Diego. The detectives made no express or implied threats either to him or his family, and the discussion was not confrontational. The court considered Adam's age and his condition during the interview, finding that he did not appear distraught, he was not crying, he was not deprived of food or sleep, the interview was short, and it did not take place immediately after he found out his brother was dead, but several days later. The detectives did not threaten any increased punishment or promise any leniency. Although the detectives encouraged Adam to tell the truth and commented on the realities of his situation, the court found that these statements were not coercive.

The prosecution did not use Adam's statements to the detectives in its case-in-chief. As described above, however, the prosecutor on cross-

12

examination impeached Adam with several of these statements, which were inconsistent with his trial testimony.

B.  *Analysis*

Involuntary statements obtained by coercion by law enforcement from a criminal suspect are inadmissible under the federal Constitution and California Constitution.  (*People v. Peoples* (2016) 62 Cal.4th 718, 740 (*Peoples*).)  To determine the voluntariness of a statement made during custodial interrogation, the key question is whether the defendant's choice to make the statement "was not ' " 'essentially free' " ' because his will was overborne by the coercive practices of his interrogator."  (*People v. Spencer* (2018) 5 Cal.5th 642, 672 (*Spencer*); see also *Peoples*, at p. 740.)  This determination does not turn on any specific fact, but rather on the totality of the circumstances.  (*Peoples*, at p. 740.)  Courts consider "several factors, including any element of police coercion, the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health."  (*Ibid.*; see also *People v. Caro* (2019) 7 Cal.5th 463, 492 (*Caro*).)  Where, as here, the interview was recorded and the facts surrounding the giving of the statements are undisputed, we independently review the trial court's determination of voluntariness.  (*Peoples*, at p. 740.)

Statements taken by law enforcement in violation of *Miranda* are inadmissible in the prosecutor's case-in-chief, but they can still be used for impeachment purposes if the defendant testifies, so long as the statements were voluntary.  (*Caro, supra*, 7 Cal.5th at p. 492; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 55 ["Although a statement obtained in violation of *Miranda* may not be introduced by the prosecution in its case-in-chief, *Miranda* was not intended to grant the suspect license to lie in his or her testimony at trial, and thus if an ensuing statement obtained in violation

13

of *Miranda* is voluntary, the statement nonetheless may be admitted to impeach a defendant who testifies differently at trial."].)

Adam contends the trial court erred in finding his statements voluntary because the detectives questioning him used coercive tactics both to secure a waiver of his *Miranda* rights and to continue eliciting admissions from him throughout the interrogation. Specifically, Adam argues that his statements were involuntary because the detectives continued urging him to talk after he invoked his right to counsel three times, did not conduct the interview in a calm manner, used aggressive tones and subtle psychological tactics, implied that lack of cooperation would result in harsh punishment, implied that he would not have assistance of counsel, wore him down to the point of feeling helpless, and suggested that he write apology letters to his brother and other family members.

We have independently reviewed the video and transcripts of Adam's interview with the detectives, and we conclude that the detectives' interview tactics do not rise to the level of coercion required to find that Adam's will was overborne. First, although the detectives repeatedly urged Adam to tell the truth and tell his "side of the story," it was not coercive for them to do so. The Supreme Court has held that "when law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises." (*People v. Carrington* (2009) 47 Cal.4th 145, 172 [defendant's statements were voluntary]; see also *People v. Linton* (2013) 56 Cal.4th 1146, 1178 [nothing coercive in police officers urging defendant to tell the truth and informing him that the sooner he told the truth, the sooner the interview would finish].)

14

We also disagree with Adam's contention that the detectives "threatened him" during the interrogation. The detectives did not engage in any abusive tactics, "[n]or was the tone of the questioning . . . particularly harsh or accusatory," contrary to Adam's assertion. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 816.) As in *Peoples, supra*, 62 Cal.4th 718, where the Supreme Court also concluded the defendant's statements were voluntary, "[t]he detectives asked defendant questions designed to build rapport but never offered him leniency for his confession and never threatened a harsher penalty if he remained silent." (*Peoples*, at p. 741.) The detectives here also did not "threaten" Adam with jail, as he argued to the trial court. Rather, they made clear they had enough evidence to take him into custody and that Adam would be going to jail that day regardless of whether he agreed to speak to the detectives.

As to the other relevant factors courts consider when determining voluntariness, we agree with the trial court's factual findings. Neither the length nor physical circumstances of Adam's interview appear to have been coercive. The interview was short. From the time the detectives entered the room until the time they stopped the interrogation, offered Adam a bathroom break, and left the room, less than 90 minutes elapsed. And although Adam was only 20 years old at the time of the interrogation, there is nothing about his age, education, or physical or mental health that appear to warrant a finding of involuntariness. He "gave coherent, responsive answers" during the interrogation and, while he stated he was very nervous, he "did not appear excessively fearful or distressed." (*Spencer, supra*, 5 Cal.5th at p. 673; *id*. at p. 674 [concluding that complained-of interrogation tactics, which included " 'repeated expressions that appellant was lying, an implication that the death penalty would be imposed, fabricated evidence against appellant,

15

and implied promises of leniency,' " did not amount to coercion].)  There were no threats of harsh punishment or promises of leniency, and the detectives clearly communicated that they were willing to honor Adam's decision if he wished to remain silent.

Based on these facts, and our independent review of the video recording of Adam's statements to the detectives, we conclude that the trial court did not err in admitting Adam's statements as impeachment evidence.

DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


IRION, Acting P. J.


RUBIN, J.